# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 17, 2012 Session

## STATE OF TENNESSEE v. VERNICA SHABREE CALLOWAY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2178     Cheryl Blackburn, Judge**

---

**No. M2011-00211-CCA-R3-CD - Filed April 4, 2014**

---

The defendant, Vernica Shabree Calloway, was convicted of aggravated child neglect, a Class A felony, and reckless aggravated assault, a Class D felony. The trial court merged the assault conviction with the neglect conviction and sentenced the defendant as a violent offender to twenty-five years in the Department of Correction. On appeal, the defendant argues that: (1) the evidence is insufficient to support her convictions; (2) the trial court erred by not requiring the State to make an election of offenses; (3) the trial court erred in not instructing the jury that it could convict her of either Count 1 or Count 2 of the indictment, but not both; (4) her convictions violate double jeopardy; (5) the trial court erred in admitting expert opinion testimony after the State violated the trial court's order with respect to the information that could be provided to the expert; (6) the trial court erred in admitting as an exhibit a "learned treatise"; (7) the trial court erred in admitting unfairly prejudicial and irrelevant evidence; (8) the trial court erred by denying her motion to redact portions of her interviews with the police and the Department of Children's Services ("DCS"); (9) the trial court erred in admitting testimony from the victim's foster mother; and (10) the trial court imposed an excessive sentence. Following our review, we remand for entry of a single judgment setting the defendant's release eligibility at 30%. We conclude that all of the defendant's other issues are without merit and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

C. Dawn Deaner, District Public Defender (on appeal and at trial); and James P. McNamara, Assistant Public Defender (at trial), for the appellant, Vernica Shabree Calloway.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel Harmon, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren and Katrin

Miller, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This cases arises out of the defendant's having given birth at home on a toilet on October 31, 2006. The defendant took her newborn daughter to a hospital several hours later, and the child survived but suffered permanent brain damage as a result of "hypoxia," or a lack of sufficient oxygen, which occurred sometime around birth. In August 2007, the defendant was indicted for the aggravated child neglect, aggravated child abuse, and attempted first degree murder of the victim. The attempted murder charge was dismissed prior to trial, however.

In order to understand the issues raised in this appeal, we must provide some background information about the defendant and her criminal history. Before the trial in this case, the defendant was charged in the deaths of three other children, Stephen Ward, Alexis Humphreys, and Stephanie Ward, who had each, at separate times, died while under her care. Stephen and Stephanie Ward were the defendant's son and daughter, and Alexis Humphreys was the daughter of the defendant's friend.

The defendant was first tried and convicted of the second degree murder of her daughter, Stephanie Ward. State v. Ward, 138 S.W.3d 245, 250 (Tenn. Crim. App. 2003). Because Stephanie was the third child in the defendant's care to die of unexplained causes, the State's expert medical witnesses in that case relied on the "'rule of three,' i.e. the first unexplained child death in the presence of a sole caregiver can be classified as SIDS [Sudden Infant Death Syndrome], with the second such death classified as undetermined, and the third and subsequent deaths result in all of the deaths being classified as homicides by asphyxiation," in concluding that Stephanie's death was a homicide by asphyxiation. Id. at 270-71. This court reversed the conviction and remanded for a new trial due to the medical experts' reliance on the "rule of three" in reaching their determinations, even though the experts did not refer to it as such, concluding that neither the "rule of three" nor the concept behind the rule was a proper foundation under the standards set forth in McDaniel v. CSX Transp. Inc., 955 S.W.2d 257, 265 (Tenn. 1997), for expert opinion testimony. Ward, 138 S.W.3d at 271.

The defendant was subsequently retried in that case. The jury acquitted her of the second degree murder charge but could not reach a unanimous verdict on a lesser-included offense. Although the charges against the defendant remained pending in that case, as well as in the cases involving the deaths of Stephen Ward and Alexis Humphreys, the State elected to try the defendant next on the charges in the case at bar.

2

In the case at bar, both the defendant and the State filed numerous pretrial motions, including a motion by the State "to use evidence of defendant's prior conduct in support of expert witness testimony pursuant to Tenn. Rules Evid. 702-705." Specifically, the State sought to be allowed to provide information to medical experts "detailing evidence of the defendant's past conduct of smothering three children to death and evidence of the defendant's claims that Stephanie and Stephen Ward had episodes in which they stopped breathing before their death[s]." The State also sought permission to provide their medical experts with evidence that the defendant had given birth to two other children who had been removed from her care and who had not suffered any episodes of breathing difficulties. The State asserted that such information was "foundational evidence to enable" their experts "to form reliable opinions as to the specific cause of [the victim's] asphyxial trauma" and to "formulate reliable opinions on whether the cause for [the victim's] injuries are the result of non-accidental trauma or resulted from some alternative cause."

The State also filed a motion to use evidence of the defendant's prior conduct pursuant to Tennessee Rule of Evidence 404(b). Specifically, the State sought permission to introduce at trial evidence "of the defendant's past conduct of causing the deaths of three other children through asphyxial trauma" and "that Stephen and Stephanie Ward sustained prior episodes of breathing difficulties while in the defendant's care prior to their deaths." The State argued that such information was "relevant to establish that [the victim] suffered asphyxial trauma through non-accidental means and that the defendant knowingly or intentionally caused such injuries." The State additionally argued that "[t]he facts surrounding the pregnancy and birth of [the victim] additionally demonstrate the defendant's repeated efforts to conceal her pregnancy from those who might intervene to protect the welfare of her child, and provide compelling circumstantial evidence of the defendant's ongoing 'common scheme or plan' to cause injury to children through means of asphyxial trauma and then to cover up her misdeeds through a web of deceit."

The State, therefore, requested that, in addition to evidence of the defendant's involvement in the deaths of the three other children, it be allowed to introduce at trial a number of other pieces of evidence, including evidence that DCS had previously removed two other children from the defendant's care during the pendency of the criminal proceedings against her based on the deaths of the three children; evidence that the defendant had violated various conditions of her bond; evidence that the defendant concealed her pregnancy during a September 5, 2006 court appearance; evidence of the defendant's efforts to conceal her pregnancy from her co-workers, employers, and various medical professionals; evidence that the defendant repeatedly provided false information about her pregnancy history; and evidence that the defendant refused to provide the names of her previous children to DCS employee Cheryl Gooch. The State argued that such evidence "provide[d] a conceptual framework for understanding the defendant's conduct in regards to the pregnancy and birth of [the victim]" and was "relevant to establish the motives behind the defendant's efforts to

3

conceal her pregnancy with [the victim], her motivations in failing to pursue appropriate prenatal care, her refusal to give birth at a hospital and her actions in concealing the delivery of [the victim] before she went to [the hospital]." The State further argued that the "other acts" evidence, which included the defendant's "entire course of conduct," was "necessary to sustain the willingness of jurors to draw the inferences necessary to reach an honest verdict, and that the exclusion of parts of this evidence would create an incomplete picture of the offenses, the relationship of the parties, and a conceptual and chronological void that would like[ly] lead to an incorrect assessment of the evidence involving the indicted acts."

Thereafter, the trial court held a series of pretrial hearings at which it considered the parties' various motions, including the ones detailed above. The trial court issued several rulings throughout the pretrial period, some of which we will review after summarizing the relevant testimony from the pretrial hearings.

### January 9, 2008 Pretrial Hearing

Lindy Miller, a physical therapist at Concentra Medical Center, testified that she began treating the defendant on October 27, 2006, for a hand injury and saw her again on October 31, 2006, and November 7, 2006. She also saw the defendant for another appointment between the October 31 and November 7 visits but could not recall the exact date. Miller obtained a medical history from the defendant during her first visit, but the defendant provided no information indicating that she was pregnant. During the October 31 visit, the defendant said she was having a lot of pain and trouble doing her exercises, so the treating orthopedic physician, Dr. Steve Salyers, prescribed medication for her. At the November 7 visit, the defendant informed Miller that she had had a baby but had been unaware that she was pregnant. Miller said she never suspected that the defendant was pregnant.

Lorraine Pipkins testified that she and the defendant had been co-workers and that the defendant lived with her at her apartment in Nashville for about a month before the instant offense. The defendant left Pipkins' apartment the night of October 31, 2006, and did not return until about a week later to collect some clothes. At that time, the defendant told Pipkins that she was going to the hospital, but Pipkins did not know that the defendant's child was in the hospital.

Detective Sarah Bruner of the Metro Police Department Youth Services Division testified that she was contacted by Virginia Thomas of the DCS to assist with interviewing the defendant regarding the circumstances of the victim's birth. Thomas informed Detective Bruner that the defendant had been charged with the deaths of three other children. Detective Bruner interviewed the defendant at Baptist Hospital on November 16, 2006. Bruner made a CD copy of the interview, which was admitted into evidence. During the interview, the

4

defendant was not physically restrained, did not appear to be under the influence of alcohol or controlled substances, and denied using drugs prior to giving birth to the victim. Explaining the victim's birth, the defendant said she had squatted over the toilet, there was a pop and a gush of water, and she then gave two pushes delivering the victim whom she pulled up to her chest. According to the defendant, she then passed out. The defendant also said the victim cried vigorously, both before the defendant passed out and later as she was taking the victim to the hospital.

The defendant brought up the names of three deceased children, Stephen Ward, Stephanie Ward, and Alexis Humphreys, in the interview and made statements about them. She talked at length about how it bothered her that people thought she was guilty of killing those children. Detective Bruner said that the defendant was not in custody at the time of the interview, which lasted three hours and twelve minutes. She acknowledged that she did not ask the defendant if she wished to have an attorney present for the interview or if she was presently represented by counsel for matters pertaining to those children. Detective Bruner learned that the defendant had also used the last names of Ward and Jackson in the past and had a criminal record under the name of Ward.

**April 21, 2008 Pretrial Hearing**

Dr. Robert Reece, a pediatrician and the director of the child protection programs at Tufts Medical Center in Boston, Massachusetts, testified his area of specialization was child abuse pediatrics and he had authored a chapter about the distinction between fatal child abuse and SIDS in the textbook, Child Abuse Medical Diagnosis and Management. He said he was the executive editor of The Quarterly Update, a review journal that "reviews articles that have to do with child abuse or things that could be confused with child abuse as well as dealing with professional issues in the field of child abuse and neglect." Dr. Reece frequently taught at conferences on subjects dealing with child abuse, including differentiating between children who suffer injuries from a suffocation method versus an accidental method. He had been qualified as an expert in the field of pediatrics and child maltreatment in ten or twelve other jurisdictions and was accepted by the trial court as an expert in that field.

Dr. Reece testified that hypoxia "means too little oxygen for the tissue that's being supplied with oxygen. So you get injury as a result of too little oxygen." He said that a hypoxic injury to the brain of a newborn can occur as the result of an accident, during the birthing process, or from intentional causes. He stated he reviewed the same sources of information when evaluating hypoxic injuries in children whether the child lived or died. He explained, "It's a matter of degree of the hypoxia as to whether or not the child goes on to death or whether it stops short of death." He said that external evidence is not always present when a child suffers a hypoxic injury and explained that "many times a baby can be

5

smothered without any external evidence of that smothering." Dr. Reece noted that when there is no physical evidence to establish how a hypoxic injury occurred, it is "critical" to have "as much information about the medical history of the baby, the social history, the family history, the genetic history, the history of the pregnancy, the labor and delivery, [Child Protective Services] involvement, [and] law enforcement involvement."

Dr. Reece acknowledged that he had not received or evaluated any of the victim's medical records, social services history, or police reports but knew that the victim had been brought to the emergency room with a hypoxic and ischemic injury resulting in the death of brain tissue as revealed by an MRI. He said that the victim's brain wave test was abnormal, indicating a cerebral injury. Dr. Reece said that, in order for him to determine the cause of the victim's hypoxic injury, he would need to know the circumstances surrounding the victim's birth, including information about the mother's health during pregnancy, how many prior pregnancies she had experienced, the length of labor, previous labors the mother may have had, whether the victim cried at the time of delivery, and whether the victim's birth had produced apnea or hypoxia. He noted that it would also be important to know the mother's pattern of behavior toward other children, whether the victim was a wanted baby and whether "this was something that would give some kind of motive to dispose of the baby." He said that inconsistent histories were "always worrisome . . . when we're trying to establish between a legitimate medical condition and something that has been produced by abuse." Medical histories for other children born to the victim's mother would also be important in formulating an opinion as to the cause of the victim's injury because there were "so many question marks around the birth of [the victim]. The previous history of other children having suffered other kinds of problems would make one lean further in the direction of saying that this is an unsafe home." Dr. Reece explained that the term "apparent life threatening events" are events that "would make one believe that a serious and possibly fatal outcome could be expected if intervention is not attempted." He said it was important to know if there was a history of similar events involving the victim's siblings and other children in the care of the defendant.

On cross-examination, Dr. Reece agreed that there was limited time for a treating physician to obtain historical information when a child is brought in to the emergency room with the symptoms the victim had. Asked what effect he thought the defendant's taking Hydrocodone on the day of the victim's birth had on the victim's condition, Dr. Reece replied, "I don't think much . . . unless it was an ongoing use of that drug. . . . I don't think that has anything to do with the [victim's] presentation." He acknowledged that there was no medical test to determine exactly when the victim's hypoxic injury occurred but said that the fact that the victim cried immediately at birth indicated "there was probably no prenatal hypoxia going on." However, he agreed that the only information he had to rely upon was what the defendant provided and that if the information was inaccurate, it called into question whether he could eliminate prebirth hypoxia or during-birth hypoxia as the cause of the

6

victim's injury. He said that if the mother had a negative social history, including drug abuse or a previous history of having abused or killed a child, "then child abuse will rise up pretty high on the list" as the cause of the injury.

Dr. Reece agreed that if a woman became pregnant, did not seek an abortion in a timely fashion, did not want the child, did not tell anyone that she was pregnant, and no one realized that she was pregnant, it would not be difficult for her to physically asphyxiate the child and cause the child's death. Because the defendant related that the victim cried immediately after birth, as well as on the way to the hospital, Dr. Reece opined that the victim did not have any signs of a hypoxic injury during birth but agreed that his conclusion rested upon the reliability and accuracy of the defendant's account of the birth.

In response to questioning from the trial court, Dr. Reece said that in determining the cause of the victim's hypoxic injury, it was important to know if any of the victim's siblings suffered from a metabolic disease or genetic condition that could lead to apnea. He also said that it would be important to know the circumstances of the victim's birth. He opined, "In this case to be perfectly honest I can't think of much else that would cause this baby to have suffered this hypoxic injury than having been asphyxiated. There's just nothing else here that I've been provided that would tell me what this is due to."

On redirect examination, Dr. Reece agreed that it was very difficult to differentiate between deaths caused by SIDS and suffocation.

### June 4, 2010 Pretrial Hearing

Cheryl Gooch, a former DCS employee, testified that she was assigned to investigate the victim's case and that she interviewed the defendant prior to the defendant's November 16, 2006 interview with Detective Bruner. During Gooch's interview, the defendant refused to provide the names of her other children despite Gooch's asking her several times. Gooch then advised her supervisor, Virginia Thomas, about the defendant's refusal to provide the names of her other children.

On August 4, 2008, the trial court entered a lengthy, detailed order in which it denied the State's motion to introduce evidence relating to the defendant's prosecution for the deaths of the three children, the removal of two children from the defendant's custody by DCS, and the defendant's bond violations. The trial court granted the State's motion to introduce evidence that the defendant concealed her pregnancy and repeatedly provided false information to medical personnel about her pregnancy, finding that such information was relevant to the defendant's motive and intent and that its probative value outweighed any prejudicial effect.

7

With respect to the State's request to provide information to its medical experts, the trial court ruled that the State could give "limited information" to their expert witnesses regarding the victim's siblings' deaths, *i.e.* that the cause of death should be disclosed but that the manner of death should be listed only as "undetermined."[1] The court specifically ruled that the experts should not be informed that the deaths of any of the defendant's other children might have resulted from homicide, finding that it would be "too prejudicial" and could potentially "slant" the opinion of the experts. Further, the trial court ruled that the State could provide their experts with information about the defendant's pregnancy with the victim, the number of prior pregnancies the defendant had experienced, her previous labors, the length of her labor, her health during pregnancy, the victim's medical records, medical histories of the defendant's other children including cause of death without indicating manner of death as anything other than undetermined, and any statements the defendant made to law enforcement or medical personnel regarding her pregnancy with the victim and the birth of the victim or the births of her other children.

## June 7-10, 2010 Trial

Lorraine Pipkins testified that she met the defendant while they were both employed at the Wendy's restaurant on Murfreesboro Road. After the two became "close," the defendant told Pipkins that she was pregnant, but, on February 10, 2006, the defendant informed Pipkins that her mother "told her that she had . . . lost the baby, she wasn't no longer pregnant." During the late summer of 2006, Pipkins and the defendant had started working together at a Mrs. Grissom's restaurant. While Pipkins and the defendant were at work one day, Pipkins overheard "a little old lady" ask the defendant if she was pregnant. The defendant responded, "[Y]ou got to be doing something to get pregnant," which Pipkins understood to mean that the defendant was not pregnant.

Pipkins said that the defendant came to live with her about a month before the victim's birth. During that time, the defendant wore baggy clothing and did not appear to be pregnant. The defendant had a white, four-door car at the time. The defendant suffered an on-the-job injury to one of her fingers while employed at Mrs. Grissom's, and her doctor excused her from work until her finger healed. The defendant had a doctor's appointment on October 31, 2006, and arrived home between 4:00 and 4:30 p.m. as Pipkins was sitting on the front porch awaiting trick-or-treaters. The defendant told Pipkins that she was "sick" and "hurting" and went inside the apartment and sat down in the living room. The defendant "kept moaning and groaning like . . . she was hurting real bad," but she refused to go to the hospital. Pipkins later noticed that the defendant had left the living room and gone into the bathroom where she remained for about forty-five minutes. While the defendant was in the

---

[1] The trial court did not allow the experts to be provided with information about the medical history or death of Alexis Humphreys because she was unrelated to the victim.

8

bathroom, Pipkins' daughter and grandchildren came to Pipkins' apartment so that one of the children could use the bathroom. The defendant, dressed in a towel, came out of the bathroom and asked Pipkins' daughter for "a pad." The defendant then went into her bedroom and put on some clothes before leaving the apartment between 7:30 and 8:00 p.m. The defendant took her purse with her when she left, and Pipkins' neighbor, Danny Gooch, told Pipkins that the defendant had taken some towels with her. Pipkins said she did not see or hear a baby that night. The next day, Pipkins noticed some blood on the toilet, the edge of the sink, and bathtub, which she cleaned. Pipkins said she talked to the defendant about a week later, and the defendant told her that she had a "busted" ovarian cyst but did not tell her she had given birth to a baby.

Latoya Pipkins,[2] Lorraine Pipkins' daughter, testified that she took her children trick-or-treating at her mother's apartment on October 31, 2006, between 4:00 and 5:00 p.m. She did not see the defendant at that time. Latoya and her children returned to her mother's apartment between 8:30 and 9:00 p.m. and went inside. Latoya saw the defendant, who was "still dressed," go into the bathroom. Latoya's daughter had to use the bathroom, but the defendant would not come out. The defendant stayed in the bathroom for "at least forty-five minutes or longer" and then stuck her head out the door and asked Latoya for a sanitary napkin. Latoya could not see inside the bathroom when the defendant opened the door. She did not hear or see a baby that night and left before the defendant came out of the bathroom.

Danny Gooch testified that he met the defendant while she was working at the Wendy's restaurant. He said that he and the defendant had sexual relations and that the defendant wore clothing when they had sex and did not appear to be pregnant. He and the defendant went to a Dollar General Store on October 30, 2006, and the defendant purchased a pregnancy test, the results of which were positive. At the time, Gooch believed the child was his. The next day, October 31, Gooch took the defendant to her physical therapy appointment for her injured finger and then to Walgreens to pick up a prescription. They then went to Lorraine Pipkins' apartment, and the defendant said that her stomach was cramping. Gooch went outside and sat on the front porch with Ms. Pipkins. When Gooch went back inside, the defendant was "just laying there crying" as if in pain. He offered to take her to the hospital, and the defendant said, "[M]aybe later on." The defendant left Pipkins' apartment sometime after 9:00 p.m., carrying her purse and a laundry basket full of clothes and towels, and told Gooch that she was going to her mother's house to wash the clothes. Gooch watched the defendant as she placed the laundry basket in the front passenger's seat of her car and then drove off. He did not see or hear a baby that night.

Gooch said that the defendant called him at about 4:00 the next morning and told him

_____

[2] Because these witnesses share the same last name, we will refer to Latoya Pipkins by her first name. We intend no disrespect in doing so.

9

she was at Baptist Hospital and asked him to come there. When he arrived at the hospital, the defendant told him she had delivered a baby. Although he did not believe that the victim was his child, he signed her birth certificate because he and the defendant were "close" and he "felt like that was [his] duty." He said he did not know the identity of the victim's father. The defendant later asked him to move her car, and he noticed some bloody towels on the driver's seat. He found the defendant's laundry basket, still containing clothes, in the trunk of the car. The defendant asked him to take the clothes she wore to the hospital home and wash them, but he did not do so because the bag containing the clothes was "full of blood." He said he threw away the defendant's clothes and the bloody towels he found in her car. When he asked the defendant where she had delivered the baby, the defendant said, "[W]e'll talk about it," but they never discussed it again.

Andre Phillips testified that he met the defendant in 2006 at the Buena Vista Apartments where the defendant's sister, Monica Ward, lived. He and the defendant dated for about a month during the early part of 2006 and had sexual relations. At the time he dated the defendant, she was living with her mother in Antioch. About two or three days after the victim's birth, he learned that the defendant had delivered a baby. He went to the hospital to see the victim because he believed she was his child. When he later talked to the defendant, she acknowledged that the victim was his child. He said he did not know that the defendant was pregnant until after the victim's birth.

Monica Ward, the defendant's sister, testified that the defendant was thirty-two years old and had six children, including Stephen, who was born on December 2, 1998; Paul, who was born in April 2000; and Jaylin, who was born in August 2001 outside of a hospital setting. She did not know the defendant was pregnant with the victim and when she talked to the defendant on October 31, 2006, the defendant did not say anything about being in labor. The defendant called Ward from the hospital in the early morning hours of November 1, 2006, and told her she had given birth on October 31 but did not say where the victim was born. The defendant told Ward that Andre Phillips was the victim's father and asked her to contact him. While Ward was at the hospital, she learned that Danny Gooch had volunteered to sign the victim's birth certificate listing himself as the father.

Officer Johnny Lawrence with the Metropolitan Nashville Police Department testified that he assisted Detective Sarah Bruner in collecting evidence at Pipkins' residence on November 22, 2006, and identified photographs he took of the residence. He also collected three samples from stains on the wall and door of the bathroom that could have been blood. The samples were submitted to the Tennessee Bureau of Investigation for analysis but tested negative for blood. He said that household bleach could "clean [blood] up where you can't find anything."

10

Dr. Steve Salyers, an orthopedic physician, testified that he treated the defendant for her workers' compensation injury. He first saw her on October 24, 2006, during which time the defendant did not advise him of her pregnancy. He again saw the defendant on November 7, 2006, and learned from Ms. Miller that the defendant had given birth. He prescribed Hydrocodone for the defendant based on her complaint of pain during the October 24 visit and acknowledged that the prescription could have been filled on a different date. On cross-examination, Dr. Salyers said that, in preparation for his trial testimony, he had consulted an obstetrician and learned that Hydrocodone was considered a safe drug for the third trimester of pregnancy.

Cassandra Hester testified that in 2006 she was the care coordinator for the Neonatal Intensive Care Unit ("NICU") at Baptist Hospital in Nashville. She said that she had "basically cared" for the victim and met with the defendant to discuss the circumstances surrounding the victim's birth. The defendant told Hester that she had given birth to the victim at home in the toilet and did not provide any information about the victim's condition at the time of birth.

Dr. Mary Jane Haynes, a neonatologist in the NICU at Baptist Hospital, testified that she examined the victim between 3:15 and 3:30 a.m. on November 1, 2006. She observed that the victim was "irritable . . . and very jittery. . . . [T]he baby was shaky and could not be consoled easily. The baby was stiff. The tone was increased." Dr. Haynes explained that increased tone meant that the victim's muscles were very rigid, or hypertonic. The victim also had an increased heart rate, or tachycardia. Because the defendant's drug screen was positive for opiates, Dr. Haynes initially thought the victim was having drug withdrawal. However, the victim's drug screen was negative, and Dr. Haynes and fellow physicians determined that the victim had suffered a hypoxic ischemic injury. The victim suffered seizures, and her blood sugar was high, which indicated significant stress or injury. The victim's sodium was low, and Dr. Haynes explained that babies get low sodium, or hyponatremia, from Syndrome of Inappropriate Antidiuretic Hormone ("SIADH"), which "typically occurs with an asphyxiating event about three days after the event occurs."

Dr. Haynes said she spoke to the defendant between 3:15 and 4:25 a.m. regarding her medical history and the circumstances of the victim's birth. The defendant reported that she had been pregnant four times and had delivered two children who were not in her custody. The defendant also reported that she had little or no prenatal care and denied any drug use with the exception of Oxycodone,[3] which she had taken for the past two days for her finger injury. As to the victim's birth, the defendant gave Dr. Haynes the following account of events:

---

[3] Dr. Haynes said that her notes reflected that the defendant reported that she was taking Oxycodone, rather than Hydrocodone. She said that both drugs are classified as opiates.

11

She told me that she had delivered at home in the toilet. She had had some pain, went to the bathroom, had a normal bowel movement, then delivered in the toilet, passed out, woke up. And I've written here sometime between 8:00 and 12:00 midnight. That's when she told me she delivered, that she wasn't sure what time it was because she didn't know how long she had been passed out. She woke up, cut the umbilical cord. She could not tell me what she used to cut the umbilical cord. She could not tell me how long the baby had been in the toilet. She couldn't tell me any of the circumstances other than the very vague details that I'm giving you. She told me that she tied the umbilical cord with a piece of gauze that she had on her injured finger. That's one thing I don't have written down, but I remember that because that was an unusual story for someone to tell me. She told me she drove herself to the hospital. That was about it. It was kind of difficult for me to talk to her. She appeared like she was high, like she was under the influence of drugs.

Dr. Haynes said that the victim's being born in the toilet "most definitely" would cause asphyxia. Dr. Haynes said that the victim's admission temperature was "ninety-six something" and opined that a baby born in a toilet would have had a much lower temperature. Because the victim was not born in the hospital, no Apgar score or blood gas test could be performed to help determine if the victim had experienced an asphyxial event from the birthing process. She acknowledged that the defendant brought the placenta to the hospital but said that there was no evidence that the placenta had abrupted or torn away prior to the delivery of the victim. The victim's umbilical cord was also examined and determined to be a short cord, which meant it was less likely that the cord had gotten tangled or knotted.

The State posed a hypothetical question in which Dr. Haynes was asked to assume that the birth history provided by the defendant was accurate, in that the defendant squatted over the toilet thinking she was going to have a bowel movement but instead delivered the victim in two pushes; that after the second push the defendant pulled the victim out and placed her on her chest before passing out; and that later the defendant regained consciousness to find the victim pink in color and crying vigorously, both before and after she passed out. Dr. Haynes said nothing in that history suggested that an asphyxial trauma occurred during the birthing process. Dr. Haynes said that a baby who suffers asphyxial trauma in utero or during the birthing process was "usually hypotonic, floppy, non[-]responsive, doesn't breathe or irregular gasping kind of efforts," which could require resuscitation. According to Dr. Haynes, conditions that could compromise a baby during the birthing process included the umbilical cord being wrapped around the baby's neck or other part of the body, which was more typical with long cords; the baby's head being trapped in the birth canal; the baby not being in the appropriate position to deliver; and the placenta breaking loose. However, there was no evidence that any of those conditions had occurred

12

and nothing in the history provided by the defendant to suggest that the victim suffered the hypoxic injury a day or so before birth. The victim had no bruising or injuries consistent with having been trapped in the birth canal. Dr. Haynes said that the victim's MRI revealed "changes that were characteristic of hypoxic-ischemic encephalopathy or an event that occurred around the time of birth." She explained that encephalopathy is abnormal brain function and said that the victim's brain injury was permanent. She said that the victim's MRI findings were "typical of an acute, sudden, severe episode of hypoxia."

Dr. Haynes said that if a baby suffered an asphyxial event in a hospital setting, the baby could be treated with head cooling therapy, but it must be done within six hours of the time of delivery. Any delay in seeking that type of therapy would compromise the welfare of the baby and make the condition worse. She said that the most important medical finding in terms of the timing of the victim's injury was the SIADH, which occurred in response to swelling of the brain. She explained that SIADH typically occurred within three days of the injury and said that the victim's sodium level was first noted to be low on November 3. She said that a low sodium level is the first clue to indicate SIADH. Dr. Haynes acknowledged that she had no way of determining exactly when the victim's hypoxic injury occurred because the victim was not born in the hospital.

Wendy Parrish, a registered nurse at Baptist Hospital, testified that she obtained the defendant's medical history at 1:50 a.m. on November 1, 2006, and the defendant reported that she had had two prior term deliveries and an abortion. The defendant also reported that she learned of her pregnancy two months prior to November 1 and had been to the Waverly Belmont Clinic twice.

Cherie Hackney testified that she was a social worker at Baptist Hospital in 2006 and met with the defendant on November 1, 2006. The defendant told Hackney that she gave birth to the victim at home on the toilet, passed out for a period of time, and, when she woke up, retrieved the victim from the toilet before driving herself to the hospital. The defendant gave no information as to how the victim presented at the time of birth or after the defendant regained consciousness. Hackney said that her notes reflected that the father of the victim, "Danny," was with the defendant at the hospital.

Jimmy Smith, an emergency room nurse at Baptist Hospital in 2006, testified that he was working the 7:00 p.m. to 7:00 a.m. shift on October 31–November 1, 2006, when an unidentified woman came into the hospital around midnight and said there was a woman in the parking lot who had delivered a baby in the car. Smith went outside and found the defendant sitting in the driver's seat of a white Ford Taurus in the last ambulance bay. The defendant, who was dressed in a sweatsuit and smelled strongly of soap or perfume, indicated that she had just given birth in the car in the parking lot, and Smith saw a newborn baby wrapped in a towel in the passenger's seat. The baby was not crying, made no movements,

and "seemed lifeless." He immediately took the baby into the hospital and gave the baby to other nurses.

Smith said that he then went back outside to tend to the defendant and noticed there was no blood or "mess" that goes along with childbirth in the car. The defendant reported that she knew she had been in labor, and when Smith asked her why she had not come to the hospital sooner, she was "very evasive" and said "it was a personal matter." Smith described the defendant's emotional affect as "an extremely flat affect. She showed . . . no real emotion, either excitement or depression." No one else was in the car with the defendant, and Smith assisted her into a wheelchair. As he helped the defendant out of the car, he noticed a "blood line" at "the crack of her bottom" and a small amount of blood, about two inches by three inches, on the driver's seat of the car. He said he would have expected a larger amount of blood if she had in fact given birth in the car. With the defendant's permission, he moved her car from the ambulance bay to a parking lot. The defendant asked him to retrieve the placenta from under the seat, and he located a plastic bag containing what he believed to be bloody tissue but did not look inside the bag. He placed the bag on the defendant's lap and wheeled her inside the hospital to the labor and delivery department.

Smith said that he gave a statement to Detective Sarah Bruner on January 9, 2007, and said that the only difference between his recollection and the statement was that the statement reflected that the defendant was holding the baby, but he remembered the baby was in the passenger's seat. He said he had no doubt that the baby was in the passenger's seat.

Virginia Thomas of the DCS testified that the defendant's other children included Stephan, who was born on April 15, 1995; Stephanie, who was born on November 13, 1997; Steven, who was born on December 2, 1998; Paul, who was born on April 8, 2000; and Jaylin, who was born in August 2001.

Dr. Carol Cistola, an OB/GYN physician, testified that she examined the defendant at the Waverly Belmont Clinic on September 15, 2006. The defendant was a walk-in patient and reported that she had not received any prenatal care. The clinic records reflected that the defendant had been advised of her pregnancy on March 16, 2006, and given an estimated due date of November 15. The defendant also saw an internal medicine doctor at the clinic on September 12 for low blood pressure. According to the medical history the defendant provided to the internal medicine doctor, the defendant had been pregnant six times and had five deliveries. However, the defendant told Dr. Cistola she had been pregnant eight times. Dr. Cistola's examination of the defendant showed no indication that the baby was going to be born prematurely, and the baby's heart rate was normal. The defendant left the clinic without getting the recommended prenatal lab work done and did not return for follow-up testing and treatment.

Dr. Cistola said that the defendant received treatment at the clinic three times in 1998 for another pregnancy. The defendant was hospitalized on September 26, 1998, for preterm labor and had a premature delivery in December 1998. The defendant also received treatment at the clinic for another pregnancy in 2000 but had only two prenatal visits although the normal number of visits for a non-high-risk mother was thirteen. For a patient who had a prior complicated pregnancy like the one the defendant had in 1998, the number of prenatal visits would have been as many as were needed and could have been daily.

Detective Sarah Bruner testified that she and another officer searched Pipkins' residence on November 22, 2006, but found no indication of blood, and they were unable to locate the defendant's car or clothing she had worn the night of the victim's birth. Detective Bruner recovered ten pink pills in a bottle labeled prenatal care, which reflected that the prescription was filled on March 16, 2006, and written for a quantity of thirty with four refills.

Detective Bruner said she later obtained the defendant's cellular telephone records which reflected a number of calls made to and from the defendant's phone on October 31 and November 1, 2006. The defendant provided no information that anyone other than she had possession of her telephone on those days. The defendant gave Detective Bruner detailed information regarding her prenatal care with Steven and Paul but did not discuss Jaylin. Detective Bruner obtained the defendant's Hydrocodone medication from Ms. Thomas and placed it into evidence. She said that the prescription bottle contained thirty-eight pills and that the paperwork accompanying the prescription reflected that forty pills were prescribed and that the prescription was filled on October 31, 2006, at 5:57 p.m.

Detective Bruner said she interviewed several witnesses, including Jimmy Smith. Smith reported that the victim was on the defendant's lap and that there was a towel in the seat of the car where the defendant had been sitting. Smith did not indicate that the defendant had reported giving birth in the car in the parking lot.

Cheryl Gooch, a DCS case manager in 2006, testified that the department received a referral concerning the victim on November 2, 2006. She was the initial case manager assigned to the case and interviewed the defendant at the DCS office, prior to Virginia Thomas' interview at the hospital. The defendant reported that she had an injured finger for which pain medication had been prescribed, but she did not inform the doctor that she was pregnant. The defendant gave the medication to Gooch, and she turned it over to Thomas. The defendant told Gooch she was about six or seven months along with her pregnancy before she found out she was pregnant. Gooch said the defendant told her that Danny Gooch had come by her residence before she gave birth to the victim, but no one was present during the birth. The defendant reported that she delivered the victim at home on the toilet between 8:30 and 9:00 p.m. and put the baby on her chest before passing out for an unknown period

15

of time. The defendant said she went to the hospital around midnight. Gooch asked the defendant several times for information regarding her other children, but the defendant refused to disclose their names.

Dr. Kendall Graham, a neonatologist at Baptist Hospital, testified that he was one of the primary physicians who began treating the victim on November 1, 2006. He described the victim's condition as "jittery and kind of irritable, difficult to console." The doctors initially thought the victim was going through drug withdrawal because of the defendant's positive drug screen and the history provided by the defendant that she had been taking a narcotic for pain relief prior to delivery. However, during the next three days, the victim began showing signs of seizure activity and SIADH, which was common in infants who had suffered an asphyxia event. The doctors realized the victim was not suffering from a narcotic withdrawal but was showing symptoms consistent with having suffered some type of asphyxia around the time of birth. An EEG performed on the victim on November 3 revealed seizure activity, and an MRI performed on November 14 or 15 showed that the victim had suffered injury to the deep parts of the brain. Dr. Graham said that the pattern of the victim's brain injuries was consistent with birth asphyxia.

Dr. Graham said that infants who suffer a serious hypoxic injury during the birthing process do not cry vigorously. He said that the victim had suffered "a mild to moderate" permanent hypoxic injury "very near the time of birth." Based upon the information the doctors had, there was no definitive way to determine whether the victim's hypoxic injury occurred before birth, at birth, or after birth. However, Dr. Graham said that he was "comfortable" in saying that the victim's injury occurred within a few hours before birth through the time of birth to a few hours afterwards. He said that the defendant's use of Hydrocodone the night of the victim's birth did not cause the victim's hypoxic injury.

Dr. Robert Reece's trial testimony reiterated that given at the pretrial hearing, and he acknowledged that he had been retained by the State to consult in the case. He further said that when evaluating whether a child suffered an asphyxial event, he looked to a broad spectrum of information, including information regarding the child's siblings, social service investigations of the family, prior police investigations, and prior medical histories of the family to determine if there were any predisposing factors for certain medical conditions. He reviewed the victim's medical records from Baptist Hospital, the police reports, social service reports, the prenatal history provided by the defendant, and the medical histories involving other children and agreed with the medical assessment that the victim sustained a hypoxic injury. He said it was "difficult" to determine the time of the injury but agreed with Drs. Haynes and Graham that it occurred at or around the time of birth. Dr. Reece said that he reviewed all of the historical information provided by the defendant and observed that "the history was changing. There were several different accounts of what happened," which was "a big red flag" to him. Dr. Reece said that he had "a very strong feeling" and had

16

determined to a reasonable degree of medical certainty that the victim's injury was the result of an induced suffocation. He related the factors he considered in reaching that conclusion:

> [T]he fact that the baby was, first of all, born in a toilet, then cried immediately after the baby was born according to the mother's account. Then there was a passing out of the mother according to her account during which time we don't know what was going on with the baby. Then there was no call for help, no call to 911 to EMS to come and help with the baby. And then there was an almost four hour delay between the time that we are told the baby was born and the arrival at the emergency department. And then even at the emergency department there was a delay of sitting in the car for a good period of time and being discovered there by one of the nurses from the hospital. So all of this makes me concerned about what was going on in that interval.

Dr. Reece said that the defendant's giving birth at home and not seeking medical assistance in a timely fashion suggested that "there wasn't a whole lot of attention being given" to the victim. In evaluating child abuse and neglect cases, a delay in seeking medical care was "[a]bsolutely" something he saw frequently. Dr. Reece said that the defendant's delay in seeking medical care, failure to call EMS at the time of delivery, "spotty" prenatal care, and failure to make arrangements for a hospital delivery constituted "a fairly neglectful approach to a newborn baby."

Dr. Reece said he had delivered approximately 150 babies and had been present when birth asphyxia occurred. In those situations, the newborns usually had a "weak cry if a cry at all." Nothing in the history provided by the defendant or in the medical findings indicated that the victim suffered the asphyxial trauma prior to birth or during the birthing process. There was no meconium on the victim's skin which indicated that the victim was "born healthy and alive and vigorous."

Dr. Reece identified a policy statement from the American Academy of Pediatrics entitled Distinguishing Sudden Infant Death Syndrome From Child Abuse Fatalities, published in July 2006, which was admitted into evidence.

Clechette Frazier-Weir, the victim's foster mother, testified that the victim came into her care on November 14, 2008, at the age of two, and weighed only fifteen pounds, could not crawl, walk, or talk, and could "[b]arely" sit up on her own. She said that at the time of trial, the victim weighed 27.14 pounds, had cerebral palsy, and was developmentally delayed. The victim was able to walk with the aid of special shoes and a K-walker when in crowds and could talk in complete sentences. Ms. Frazier-Weir explained that she "constantly" worked with the victim and described the type of care the victim needs:

17

In a day we do over eighty exercises a day. Feeding was taking like an hour and a half . . . for her to really feed herself. To get all of her therapy at home and then going to physical therapy and getting it done – because what they implement at Vanderbilt I take home and just keep adding to it. So it's a day's work.

In addition, the victim received speech therapy and had to see a neurologist and orthopedic doctor annually. Ms. Frazier-Weir said that she planned to adopt the victim.

The defendant elected not to testify and presented no proof. The jury convicted her of aggravated child neglect as charged in Count 1 of the indictment and of the lesser-included offense of reckless aggravated assault in Count 2, which the trial court merged with the neglect conviction.

At the sentencing hearing, Ms. Frazier-Weir testified that the victim's doctors had informed her that the victim would always need assistance and would never be able to live independently.

## ANALYSIS

### I. Sufficiency of the Evidence

The defendant contends that the evidence is insufficient to support her conviction for aggravated child neglect, charged in Count 1, because it does not show beyond a reasonable doubt that her alleged neglect resulted in serious bodily injury to the victim or that she knew the victim was injured, and that, as to both Counts 1 and 2, the State failed to establish she was criminally responsible for the victim's brain injury, *i.e.* that "some act or failure by [the defendant] actually caused [the victim's] injury."

In assessing these claims, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State

and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As we have set out, the defendant was tried on Count 1, where she was charged with and convicted of aggravated child neglect, and Count 2, where she was charged with aggravated child abuse and convicted of reckless aggravated assault, which then was merged into the conviction for Count 1. The State provided the following information in response to her request for a bill of particulars as to these two charges:

> Count[] 1 – Aggravated Child Neglect. Alleges defendant engages in an ongoing course of conduct in neglecting welfare of [the victim] including failing to seek prenatal care, concealing pregnancy, using a narcotic drug within hours of delivering, delivering [the] baby unassisted outside of a hospital setting, depriving victim of oxygen, and delaying taking [the] baby to [the] hospital. As a result of this the victim sustains hypoxic and ischemic injury to the brain which results in death of brain tissue. Victim also experiences transient tachypnea, hyponatremia, abnormal EEG's and ongoing seizures.[4]

> Count[] 2 – Aggravated Child Abuse. Alleges defendant knowingly deprives

---

[4] The State acknowledges on appeal that there appears to be no judicial decision in Tennessee regarding a defendant's "calculated and extended effort to neglect the victim's existence – both in utero and after birth," as alleged in the bill of particulars regarding Count 1 of the indictment. Our child abuse and neglect statute has been specifically held not to extend to a fetus, as this court discussed in Tabitha Ann Trice v. State, No. M2006-01051-CCA-R9-CO, 2009 WL 29926 (Tenn. Crim. App. Jan. 6, 2009). Thus, the statute does not criminalize the defendant's acts in concealing her pregnancy, failing to seek prenatal care, and otherwise attempting to "negate" the victim's existence while still in utero.

19

the victim of oxygen after giving birth. As a result of this the victim sustains hypoxic and ischemic injury to the brain which results in death of brain tissue. Victim also experiences transient tachypnea, hyponatremia, abnormal EEG's and ongoing seizures.

## A. Aggravated Child Neglect

In our review of the defendant's conviction for aggravated child neglect, we first note our supreme court concluded in State v. Dorantes, 331 S.W.3d 370, 385 n.15 (Tenn. 2011), that, as a result of the 1998 amendment to Tennessee Code Annotated section 39-15-402, "aggravated child abuse and aggravated child neglect [are] separate offenses." Additionally, in State v. Mateyko, 53 S.W.3d 666, 671-72 (Tenn. 2001), the court explained that a conviction for child neglect requires that the State show "the defendant's neglect produced an actual, deleterious effect or harm upon the child's health and welfare." Relying on these cases, the defendant argues that the evidence is insufficient to sustain her conviction for aggravated child neglect because the State failed to prove beyond a reasonable doubt that her alleged neglect itself resulted in serious bodily injury to the victim or that she knew the victim was injured.

Aggravated child neglect occurs when a person "knowingly, other than by accidental means, . . . neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare," and serious bodily injury results. See Tenn. Code Ann. §§ 39-15-401(a), -402(a)(1) (2006). "Serious bodily injury" is defined as bodily injury involving: "(A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; or (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty." Id. § 39-11-106(34).

Previously, we have set out testimony of medical experts relevant to the defendant's convictions. We will review testimony relating to this issue.

As we have set out, Jimmy Smith, an emergency room nurse at Baptist Hospital in 2006, testified that, as he was working his shift on October 31-November 1, 2006, around midnight he learned that a woman was in a car in the parking lot, where she had given birth. He went outside and located the defendant sitting in the driver's seat of a vehicle, and she indicated she had just given birth in the parking lot. He saw a newborn baby, who "seemed lifeless," wrapped in a towel on the passenger's seat. He immediately took the baby into the hospital. When he returned to the defendant's vehicle, she was "evasive" as to why she had not come into the hospital earlier and exhibited "no real emotion, either excitement or depression."

The State presented expert proof as to the effect of the delay of the defendant in seeking medical assistance for the victim. Dr. Mary Jane Haynes was questioned regarding specific medical treatment the victim could have received had she been taken to the hospital in a timely fashion after her birth and the effect of the delay:

Q. Dr. Haynes, just from the standpoint of the injury that you did see would delays in development, delays in speech, delays in coordination be consistent with this type of brain injury?

A. Yes, it would. You could expect anything from muscular problems, . . . such as cerebral palsy to weakness. You could see thinking problems, mental retardation, behavior problems. It's a whole spectrum of disabilities that it's impossible to predict until the baby is expected to meet the milestones what's going to happen.

Q. Now, you mentioned that we're all different, all unique. Does the severity of the hypoxic event, its duration, have any impact on the severity of the underlying injury to the brain?

A. It requires a certain degree of hypoxia to get a brain injury, and babies who have a more significant hypoxic event, if the hypoxia is for a longer duration, those babies are more likely to have more damage. They will have more damage. But there's not a recipe or a formula that says that if the baby is without oxygen for this many minutes or for this many hours that it's going to have . . . it depends on the degree. It's not an exact science.

Q. Okay. Is there any way to tell from the MRI here how long or how long of a period [the victim] had a hypoxic injury for in order to get that injury that was seen?

A. The MRI findings are typical of an acute, sudden, severe episode of hypoxia.

Q. Okay. Now, you've used a number of terms. But you've also talked about sort of this spectrum of severity.

A. Uh-huh.

Q. Some children who suffer [a] hypoxic event, do they die?

A. Yes, they do.

21

Q. Some who suffer [a] hypoxic event have little to not [sic] severe consequences?

A. Yes.

Q. And then some fall in that in between spectrum?

A. That's true.

Q. Okay. Assuming that we had two similarly aged children shortly after birth who suffer the same duration of hypoxic injury, are those two children going to have the same manifestations or same consequences?

A. No, they're not. They may, but not necessarily.

Q. So a hypoxic event of two minutes of duration, for example, of baby A and baby B can produce different results in each?

A. Yes.

Q. Now, you've talked about cases in which you've been involved where there was an asphyxial trauma at the time of birth or during the labor process, and you talked about babies that came out and presented with certain pictures. One of the things I think you talked about is needing resuscitation. Do some of those babies come out and they're essentially comatose?

A. Yes.

Q. Did [the victim], when you examined her on the early morning hours of November 1st, show any signs of being depressed, lethargic, or comatose?

A. No, she was hypertonic and jittery and irritable, things that are consistent with a basal ganglia or a thalamic injury.

Q. What is the fact that she is not comatose say in terms of the severity of the injury?

A. It may have been a more mild injury. It may have been an injury of shorter duration. But it's impossible to say. Just as an example, I deal with a lot of very, very small babies, very immature babies, some babies that are born that just are simply too small or too young to resuscitate. Sometimes we leave

22

these babies with their mothers because the mothers want to hold the babies. There's nothing we can do for the baby. And the baby may be blue with a very low heart rate and essentially no respiratory effort, and then in fifteen minutes the baby may be not so blue, breathing a little bit. And then the baby will die. But . . . babies can have . . . a not so great start and then kind of self-recover.

Q. Is there a reason why an MRI in a situation like this should be done at a later point in time?

A. Because the changes are evolving, the changes aren't static.

Q. Would you describe what you mean by that and how that works in a case like this?

A. Okay. An MRI that you do early after delivery when the event has occurred right around the time of delivery may not show the injury. It may – it takes a while for the injury to develop and become apparent on the MRI.

Q. You described that this is a finding that's consistent with an acute hypoxic event?

A. Yes.

Q. All right. What happens – so the injury takes place at point A, and you're saying at or around the time of birth or after birth. What happens to the brain as it evolves from that initial insult? Let me ask it this way.

A. Okay.

Q. Are there further consequences from that initial insult that occur because of the insult in terms of how that brain either becomes necrotic or has other types of chemical changes or biological changes from the original hypoxic insult?

A. Well, it depends on – again, that's going to depend on the baby. I'm not sure . . . what you're asking. But, . . . there are different things that we can do. You know, it's very cutting edge technology. But babies who are asphyxiated – it depends on the conditions that they're maintained under. The current therapy is cooling, head cooling. Which this baby wasn't born in the hospital, so that didn't happen. But it depends on all the factors with the baby as to

23

what the outcome is, as to what changes occur in the brain. If it's the acute immediate injury, then apoptosis occurs. The cells are programmed to die. But ongoing hypoxia could cause a necrotic sort of picture.

Dr. Haynes then explained the purpose of cooling the brain of a baby who has suffered an asphyxial event:

Q. [L]et's go back to that scenario. Assuming that a baby is born in the hospital setting and you know based on the monitoring of the mother and the baby that an asphyxial event has taken place, you said that one of the treatments that can be done is cooling?

A. Yes.

Q. Why is that done, and what is the purpose of doing that?

A. It seems to slow down the program cell death, the apoptosis. The early studies show that there's much better outcome when babies undergo head cooling after they've had an asphyxiating event. But they have to be cooled within six hours of the time of delivery.

Q. So you have a very narrow window of time that you're dealing with that?

A. Yes, it's six hours.

Q. So a situation in which an asphyxial event takes place outside of a hospital setting it would be important for that child to be seen in the emergency room or the Neonatal Intensive Care Unit to evaluate and look for the potential to provide that type of therapy?

A. Yes.

Q. Delays in seeking that therapy would potential[ly] compromise the welfare of that baby?

A. Yes.

We will review the authorities relied upon by the defendant to support her claim that the State failed to show "her neglect of the victim resulted in serious bodily injury beyond that caused by her reckless aggravated assault of the victim."

In State v. Wanda Elaine Brock, No. E2009-00785-CCA-R3-CD, 2011 WL 900053, at *5 (Tenn. Crim. App. Mar. 16, 2011), the defendant burned the palm of the child victim with a cigarette, resulting in convictions for both aggravated child abuse and aggravated child neglect. The injury was treated with Neosporin ointment and a band-aid, which a physician acknowledged was the correct treatment. While this court sustained the conviction for aggravated child abuse, we reversed that for aggravated child neglect, concluding that "[t]he record is devoid of any evidence that the victim suffered further harm or injury subsequent to the initial abuse." Id. at *6. See State v. Marcos Acosta Raymundo, No. M2009-00726-CCA-R3-CD, 2010 WL 4540207, at *15 (Tenn. Crim. App. Nov. 10, 2010) (concluding that the defendant's delay in seeking help for the victim until she collapsed did not have an actual, deleterious effect on her health because the victim's collapse was caused by the abuse, not the delay); State v. John Barlow, No. W2008-01128-CCA-R3-CD, 2010 WL 1687772, at *11 (Tenn. Crim. App. Apr. 26, 2010) (holding the evidence failed to demonstrate that the defendant's delay in seeking medical care for the victim caused additional brain damage when medical experts testified generally to the risk of continued swelling of the brain but the evidence failed to show an actual, deleterious effect on the victim caused by the delay), perm. app. denied (Tenn. Sept. 24, 2010); State v. Denise Wiggins, No. W2006-01516-CCA-R3-CD, 2007 WL 3254716, at *5 (Tenn. Crim. App. Nov. 2, 2007) (evidence showed that the burn from an iron, rather than the defendant's failure to seek medical help, caused the victim's serious bodily injury), perm. app. denied (Tenn. Mar. 3, 2008); and State v. Vernita Freeman, No. W2005-02904-CCA-R3-CD, 2007 WL 426710, at *8-9 (Tenn. Crim. App. Feb. 6, 2007) ("proof established that it was the [defendant's] acts of abuse which produced the serious bodily injury to the minor victim" and "[a]t no time . . . did the prosecution attempt to distinguish the separate counts of child abuse and child neglect based upon spatial or factual differences").

The situations in these cases and others relied upon by the defendant in this regard contrast with those in which the victims sustained injuries from both an initial injury and a delay in seeking treatment, aggravated child abuse and aggravated child neglect, allowing both convictions to stand. See State v. Lakeisha Margaret Watkins, No. M2009-02607-CCA-R3-CD, 2011 WL 2682173, at *18-25 (Tenn. Crim. App. July 8, 2011) (affirming conviction for aggravated child neglect when the defendant's failure to seek medical attention for infant's multiple contusions to his face and brain and also a concussion until after victim stopped breathing caused injury to his brain from the lack of oxygen and the defendant's "failure to seek medical treatment after the first seizure posed a substantial risk of death"), perm. app. denied (Tenn. Nov. 15, 2011); and State v. Christopher Earl Watts, No. M2009-02570-CCA-R3-CD, 2012 WL 1591730, at *19 (Tenn. Crim. App. May 3, 2012) (defendant's conviction for aggravated child neglect was affirmed, the proof showing that, after the fifteen-month-old victim had suffered a seizure in the morning, he and his co-defendant, the victim's mother, did not seek medical attention until the victim had stopped breathing that evening, the delay resulting in permanent brain injury), perm. app.

25

denied (Tenn. Sept. 21, 2012). The situation in the present appeal is much like those in Watkins and Watts.

We have set out substantial testimony from which a reasonable jury could have concluded that the defendant's actions caused separate serious injuries to the victim and that she knew the victim was injured but delayed seeking medical assistance. Lorraine Pipkins, with whom the defendant lived at the time of the victim's birth, said that, the evening of the birth, the defendant "kept moaning and groaning like . . . she was hurting real bad" and refused to go to a hospital but, instead, went into the bathroom, where she remained for about forty-five minutes. She came out of the bathroom dressed in a towel, asked for a sanitary napkin, dressed herself, and left the apartment between 7:30 and 8:00 p.m. Nurse Jimmy Smith testified that he encountered the defendant, sitting in the driver's seat of her vehicle at the Baptist Hospital parking lot, and saw the victim, who "seemed lifeless," in the passenger seat.

Latoya Pipkins, Lorraine Pipkins' daughter, testified that, when she asked to use the bathroom that evening, the defendant would not come out. Neither she nor her mother saw or heard a baby that night. The next morning, there was blood on the toilet, sink, and bathtub. Danny Gooch testified that the defendant left Pipkins' apartment around 9:00 p.m. that evening carrying a laundry basket full of clothes and towels, saying that she was going to her mother's house to wash clothes. She put the basket in the front seat of her car and drove off. He, also, neither saw nor heard a baby that night. At around 4:00 a.m. the following morning, he went to Baptist Hospital in response to the defendant's telephone call, and she told him that she had given birth. Later, when he moved the defendant's car, he saw the defendant's clothes, which were "full of blood," as well as bloody towels. He threw away these items, as well as the defendant's bloody clothes. We have set out in detail the testimony of Dr. Mary Jane Haynes, who testified that the welfare of a baby suffering a asphyxial event, as did the victim, would be compromised unless treated with cooling therapy within six hours of delivery. From this, and the other testimony detailed in this opinion, we conclude that a reasonable jury could have found that the defendant knowingly neglected the newborn victim so as to adversely affect her health and welfare, causing serious bodily injury, in that she was secretive, both in giving birth and taking the victim out of Pipkins' house, and in that she delayed seeking medical assistance, resulting in severe permanent injuries to the victim. Accordingly, the proof supports the defendant's conviction for aggravated child neglect.

### B. Reckless Aggravated Assault

This offense is committed when a person recklessly commits an assault and causes serious bodily injury to another. See Tenn. Code Ann. § 39-13-102(a)(2)(A) (2006). "'Reckless' means that a person acts recklessly with respect to circumstances surrounding

the conduct or the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint[.]" Id. § 39-11-106(a)(31). Thus, to sustain the conviction for reckless aggravated assault, the State was required to prove beyond a reasonable doubt that the defendant was aware of, but consciously disregarded, a substantial and unjustifiable risk that her actions surrounding the birth of the victim caused serious bodily injury to the victim.

As we have set out, the State's bill of particulars stated that the defendant committed aggravated child abuse by "knowingly depriv[ing] the victim of oxygen after giving birth."

Dr. Robert Reece, the State's child abuse expert, testified that the victim's injury occurred at or around the time of birth. He further said he had determined to a reasonable degree of medical certainty, due to the circumstances surrounding the defendant's pregnancy, her changing stories, the manner in which she chose to give birth, and her delay in seeking medical care for the victim, that the victim's injuries were the result of an induced suffocation:

Q. Ultimately, Dr. Reece, did you form an opinion to a reasonable degree of medical certainty as to whether or not you believe [the victim] sustained an asphyxial trauma as a result of accidental or non accidental or natural means?

A. Yes.

Q. And what was that conclusion?

A. My conclusion was that this did not occur accidentally, that it was probably induced.

Q. And when you mean "probably," what do you mean by that?

A. More likely than not. I think there was a very strong – I have a very strong feeling that this actually was an induced suffocation.

Q. And in formulating your opinions[,] what information are you focusing on in that respect?

A. Well, the fact that the baby was, first of all, born in a toilet, then cried immediately after the baby was born according to the mother's account. Then

27

there was a passing out of the mother according to her account during which time we don't know what was going on with the baby. Then there was no call for help, no call to 911 to EMS to come and help with the baby. And then there was an almost four hour delay between the time that we are told the baby was born and the arrival at the emergency department. And then even at the emergency department there was a delay of sitting in the car for a good period of time and being discovered there by one of the nurses from the hospital. So all of this makes me concerned about what was going on in that interval.

. . . .

Q. Is there anything about that scenario then that supports a suggestion that the asphyxial trauma is occurring during the birthing process itself?

A. It would mitigate against that.

Q. Meaning it lessens the likelihood?

A. Yes.

Q. And is there any information that suggests that the cord was tied up or wrapped around the baby that might cause injury?

A. No, there was something actually in the record about this being . . . a short umbilical cord, so that the possibility of this being wrapped around the neck seemed much less than it would in a longer cord baby.

Q. Was there any medical information in terms of the evaluation of the placenta or the mother's uterus that suggested the baby was compromised in utero or prior to birth?

A. No, the placenta was fine.

. . . .

Q. Dr. Reece, did you form an opinion to a reasonable degree of medical diagnosis in this case as to whether or not [the victim] sustained hypoxic injury as a result of neglect [sic] behavior?

[A.] Yes.

28

Q. What information did you use in formulating that opinion?

A. Well, the things that we've been talking about, the delay in seeking medical care, the failure to call EMS at the time of the delivery. Going back to the prenatal care, which was spotty at best. The diagnosis was made of pregnancy, I think it was in March, and then there was no other visit until a couple of weeks prior to the delivery. And there w[ere] no arrangements made for a hospital delivery. So that the whole process was one of what I would consider a fairly neglectful approach to a newborn baby.

Q. . . . In your opinion is the condition of the baby having hypertonia within – or at 3:30 a.m. on the day of admission anything that points to a conclusion that this baby had to have sustained the asphyxial trauma prior to birth?

A. No.

Q. From your perspective is there any medical – based on all the consideration of the medical information that you've evaluated, the historical information that you've evaluated in this case, and the circumstances surrounding this birth, is there anything that points to this being something other than an injury occurring as a result of child abuse or child neglect?

A. I don't see it.

Dr. Kendall Graham testified that the pattern of the victim's brain injuries was consistent with birth asphyxia, which occurred "very near the time of birth." Although he was "comfortable" in saying that the injury occurred during the period from a few hours before birth to a few hours afterwards, he testified that there was no definitive way to determine when exactly it occurred during this period.

Dr. Mary Jane Haynes testified that being born in the toilet "most definitely" would cause the victim to suffer asphyxia, but she also said that she would expect a baby born in a toilet to have a much lower temperature than the victim's temperature upon admission. She stated that there was no evidence that the placenta had abrupted or torn away prior to the delivery, of the umbilical cord's having wrapped around the victim's neck during the birthing process, or of the victim's head having been trapped in the birth canal, all of which would suggest that the hypoxia did not occur prior to or during the birth. However, because the victim was not born in a hospital, Dr. Haynes was unable to determine exactly when her hypoxic injury occurred. Dr. Haynes additionally testified, as we set out more fully in our consideration of the evidence as to the aggravated child neglect conviction, that the victim could have received head cooling therapy for up to six hours following her birth and that any

29

delay in administering that treatment would compromise the welfare of the baby and make the condition worse.

We have set out the elements of the offense of reckless aggravated assault, which was an included offense in Count 2. Based upon the testimonies of the State's expert witnesses, we conclude that a reasonable jury could have determined that the victim's initial injuries were caused by the defendant's reckless conduct amounting to an assault at birth, resulting in serious bodily injury to the victim, and, thus, that the defendant committed the offense of reckless aggravated assault. This claim is without merit.

## II. Election as to Count 2

As to Issues II, III, and IV, the defendant relies upon closely related arguments, all based upon her view that "the State's mistake . . . was in arguing that the jury could find [the defendant] guilty of a single offense of aggravated child abuse using any of these 'different' and 'multiple scenarios' of abuse," the scenarios consisting of the allegations in the bill of particulars as to aggravated child neglect. In our review, we first will determine whether we agree that the "mistake" had the effect claimed by the defendant.

The indictments, as detailed in the bill of particulars, charged the defendant with aggravated child neglect, Count 1, consisting of a multi-act "ongoing course of conduct," ranging, roughly chronologically, from "failing to seek prenatal care" to "delaying taking [the] baby to the hospital." This conduct included "depriving [the] victim of oxygen." By contrast, the aggravated child abuse charge, Count 2, consisted of the single act of "knowingly depriv[ing] the victim of oxygen after giving birth."

We will set out the relevant portion of the State's closing argument to review the defendant's claim in context, putting in italics the sentence upon which she relies as overriding the bill of particulars so that aggravated child abuse was no longer based upon the single act of "knowingly depriving" the victim of oxygen but, instead, upon the same, multiple acts as aggravated child neglect:

> [W]hat's the evidence of neglect? Her failure to go to prenatal visits, her failure to follow through, her hiding her pregnancy? All of that behavior reflects her knowledge and her intent to, in fact, engage in neglectful behavior. And it follows through all the way up until the point in time where Jimmy Smith walks out and collects that baby. Because that neglect is an ongoing course of conduct here. What do we know about that behavior? We know from moment one there was never any intention that that baby be born in a hospital. [The defendant] made every decision along the lines to avoid that scenario despite the fact that she knew that on prior occasion she had given

30

birth outside of a hospital setting, that on a prior occasion she had a pregnancy that required her to be hospitalized for two months, that despite the advice to follow through with prenatal care and make arrangements for that she deliberately, intentionally, knowingly chose to do that. Why did she do that? I can't give you the answer. But the acts reflect that intention. The acts reflect that knowledge.

So what are the scenarios for neglect? Well, there are multiple. She neglected that welfare of that child under one scenario by simply having a baby outside of a hospital setting knowing what that risk was and creating that environment. Under one scenario, the scenario she gives to Dr. Haynes, she gives birth in a toilet. And Dr. Haynes tells you that in and of itself could have produced this asphyxial trauma. Under another scenario she neglects the welfare of that baby by placing the baby up against her chest and passing out, positional asphyxia. That's certainly a possibility in this case. A third one, she puts the baby in a clothes basket to secrete the baby and carries it outside. Positional asphyxia there? Again, a possible scenario. And the fourth possible scenario, of course, is that she deliberately smothers that baby, whether to stop it from crying or for some other even more sinister purpose. And then finally the last scenario that the very act of delaying taking that child to the hospital involves the additional infliction of serious bodily injury. The failure to give information about what happened surrounding that birth deprives that child of that very brief window of opportunity when that child might have been helped. Six hours in which it could be cooled on the brain. And Dr. Haynes told you that that worsens this child's condition. *Under any of those scenarios the defendant is guilty of aggravated child abuse or aggravated child neglect.* (emphasis added).

Aggravated child abuse is not an ongoing behavior. It is a specific point in time. But, again, the behavior here on that night reflects that this happened other than by accidental means. It did not occur during the birth. There is not one shred of medical proof that substantiates the version that they want you to accept, that somehow, some way this happened during the birthing process. Not one scintilla of evidence. Sure, is it possible out there in the realm of medical potential? Every doctor that walked into this courtroom told you, yes, it is. But is that a reasonable doubt in this case when there is no medical evidence to support that? I submit that there is not.

Thus, for her argument to succeed as to Issues II, III, and IV, the defendant relies upon her view that, by this italicized sentence, the State abandoned the claim of its bill of particulars as to aggravated child abuse and adopted the multi-claims for aggravated child

31

neglect. She does not consider the possibility that the State simply made an errant comment when moving from a discussion of the "scenarios" of acts constituting aggravated child neglect to that which was the "specific point" in time she committed aggravated child abuse. Her arguments as to Issues II, III, and IV of her brief are predicated solely upon this view.

As to her analysis on appeal, we note that the defendant did not object as the questioned statement was made during the rebuttal argument or complain that the State was taking a position contrary to the bill of particulars. Further, she made no request for a curative instruction, either during the State's argument or at the conclusion of the trial. Accordingly, as we will explain, we disagree with the basic assumption of this argument.

We have several reasons for concluding that the State's comment was an errant statement. First, in the relevant passages of the transcript, the State was arguing as to the several acts which constituted child neglect, ranging from in utero lack of care to delaying seeking medical treatment. During the references to aggravated child neglect, the State continued to use the word "scenarios" and tracked the allegations of the bill of particulars. As the State was moving then to arguing that the evidence showed the defendant had committed aggravated child abuse, the prosecutor stated that, under the scenarios outlined, the jury could convict the defendant of aggravated child neglect or aggravated child abuse. The defendant did not make a contemporaneous objection to what would appear to have been a total reversal of the specifics of the bill of particulars, nor ask for a curative instruction either then or later.

To support her argument, the defendant relies upon statements of the trial court and the prosecutor that the two counts consisted of the same act or acts committed in alternative fashions. Responding to the defendant's request that the two charges required that an election be made, the prosecutor stated that they presented "alternative theories," and the trial court responded, "Sort of the same thing as a first degree murder, either premeditated or felony murder as being alternatives." The defendant's interpretation of these statements does not consider the fact that the two counts shared the claim the defendant had deprived the victim of oxygen, with this being the sole allegation in the bill of particulars as to the child abuse charge and one of a series as to child neglect. The record does not show whether the exchange between the State and the trial court was recognizing the allegation common to both counts or as the defendant has interpreted it. Accordingly, we conclude that this interchange, while relevant, does not necessarily support the defendant's argument.

Supporting her position on this issue, the defendant relies on the holding in State v. Derrell F. Nunn, Sr. & Jamila Nunn, No. E2007-02333-CCA-R3-CD, 2009 WL 4790211, at *27 (Tenn. Crim. App. Dec. 14, 2009), perm. app. denied (Tenn. May 12, 2010), to argue that the State should have been required to elect which of the several acts was the basis for the Count 2 charge of aggravated child abuse. In Derrell F. Nunn, the indictment "charged

that the Defendants committed the offense of child abuse 'on or before September 5, 2002' [and, at the trial] [t]he state presented evidence that the victim had older injuries, occurring before that date, as well as a new brain injury on that date." Id. Thus, the court concluded that the State should have made an election as to which of the "multiple injuries" was the basis for the charge of aggravated child abuse. This holding is relevant only if we accept the defendant's interpretation of the State's rebuttal, which we do not.

Similarly, in State v. Janet Huffine Dykes, No. E2001-01722-CCA-R3-CD, 2002 WL 1974147, at *6 (Tenn. Crim. App. Aug. 16, 2002), also cited by the defendant, the young victim was diagnosed as having sustained various fractures, some of which were healing, while others had occurred within forty-eight hours of the x-rays. As the result of these injuries to the victim, the defendant was convicted of reckless aggravated assault and aggravated child abuse through neglect, with the assault conviction merging into the greater neglect conviction.

On appeal, the conviction for aggravated child abuse through neglect was reversed because there "there [was] simply no proof in the record that the Defendant knew [the victim] was injured and delayed seeking treatment for those injuries such that serious bodily injury resulted." Id. That situation is unlike the one presented by the present appeal, and we previously have explained why the proof is sufficient to sustain the convictions both for Counts 1 and 2.

Additionally, the defendant relies upon State v. Phillips, 924 S.W.2d 662, 665 (Tenn. 1996), in which that defendant forced various sexual acts on the victim during a period of several hours. This case, she argues, required that the State "make an election as to which alleged act by [the defendant] constituted the 'treated' element of the single aggravated child abuse count." Again, this is relevant only if we accept her claim that, by a single sentence in the rebuttal argument, the State adopted for child abuse the bill of particulars' multi-claims for child neglect. Thus, neither the court's holding in Phillips nor the similar one in State v. Adams, 24 S.W.3d 289, 294 (Tenn. 2000), is relevant to the defendant's claim.

The cases relied upon by the defendant as to this issue are relevant only if we accept her view that, by the questioned statement in its rebuttal argument, the State changed its previous position to become that the "scenarios" for aggravated child neglect replaced the single act previously alleged for aggravated child abuse. Since we do not agree with the argument, the authorities upon which she relies are not relevant. There was no election to be made as to Count 2.

This issue is without merit.

### III. Jury Instruction that Defendant Could Not
### Be Convicted as to Both Counts 1 and 2

The defendant makes the related argument that the trial court erred by not instructing the jury that it could find the defendant guilty of aggravated child abuse or aggravated child neglect, but not both. Such an instruction was required, according to the defendant's argument, because she was charged pursuant to two different theories regarding the same event. The State responds that the defendant failed to request such a charge and that the court's giving of the pattern unanimity instruction was sufficient in this regard. To the State's response that the defendant cannot raise this issue on appeal because she did not do so in the trial court, the defendant says this court may consider this claim utilizing a "plain error" analysis.

In support of her argument, the defendant relies upon the holdings of this court in State v. Vernita Freeman, No. W2005-02904-CCA-R3-CD, 2007 WL 426710 (Tenn. Crim. App. Feb. 6, 2007), and State v. Randy Lee Ownby, No. M2007-01367-CCA-R3-CD, 2009 WL 112582 (Tenn. Crim. App. Jan. 14, 2009), both of which we will consider.

In Vernita Freeman, the eleven-month-old victim had injuries consistent with being shaken and hitting a wall. The defendant was charged, *inter alia*, with aggravated child abuse and aggravated child neglect, based upon these injuries. This court concluded that the proof was sufficient to establish aggravated child abuse but not neglect, for it showed that the acts of abuse "produced the serious bodily injury to the minor victim." Vernita Freeman, 2007 WL 426710, at *8. The court explained that "if the State is proceeding upon alternative theories, the jury should be instructed that they can find the defendant guilty of one or the other of the theories, but not both." Id. at *9 n.2.

In Randy Lee Ownby, the defendant was indicted for two counts of aggravated child abuse, two counts of aggravated child neglect, two counts of child abuse, two counts of child neglect, two counts of aggravated assault, and two counts of reckless endangerment. The injuries to the infant victim apparently were inflicted during a period of several months, from the time of her birth on January 18, 2006, and her examination by a pediatrician on May 2, 2006. Randy Lee Ownby, 2009 WL 112582, at *1. In the trial of that matter, the victim's injuries were described as "three old rib fractures and three new rib fractures, all on the posterior left side . . . three lower leg fractures; a fracture at the hip and a fracture around the knee (both on the femur bone), and a fracture at the very end of the ankle . . . [and] one additional new rib fracture, bringing the total of new left-side rib fractures to four." Id. at *5. The old and the new rib fractures were estimated to have been inflicted during a time span of "approximately three to four weeks." Id. The defendant was convicted of two counts of aggravated child abuse and two counts of child abuse. The defendant argued on appeal that the trial court erred in not providing an instruction that the jury must elect

between the offenses of aggravated child abuse and aggravated child neglect. Id. at *12. Relying upon the holding in Vernita Freeman, the court concluded "the trial court had an obligation to ensure that the jury was unanimous in its verdict," and by not doing so, the court committed reversible error. Id. at *17. These two cases are relevant only if we accept the defendant's view of the "mistake" in the State's rebuttal, which we do not.

As for the defendant's assertion that the verdicts for Counts 1 and 2 in the present appeal are mutually exclusive, requiring reversals of both, we disagree.[5] While the defendant points to statements of the prosecution and the trial court that the charges involved a crime which could be committed by two different means, such as felony murder or murder first degree, we do not find that fact determinative. The child neglect charge was based upon the defendant's "ongoing course of conduct" in neglecting the welfare of the victim, "failing to seek prenatal care," and "delaying taking [the] baby to [the] hospital." This "ongoing course" included "depriving [the] victim of oxygen." The child abuse charge was based upon the claim that the "defendant knowingly deprive[d] the victim of oxygen after giving birth." Thus, the act which was the sole basis for the child abuse indictment was one of a series in the "ongoing course of conduct" resulting in the child neglect charge. So, in that sense, the State was alleging that the single act of depriving the victim of oxygen was alleged to have been committed in two different ways. The defendant does not address this possibility in her analysis asserting that the verdicts are mutually exclusive.

The State argues that since this claim was not raised in the trial court, it is waived for purposes of appeal, absent plain error. We agree. See Tenn. R. App. P. 3(e) (providing for waiver of issues not specifically stated in a motion for new trial); State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010) (stating that a defendant waives those issues not raised in a motion for new trial and those issues are subject to plain error review). In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete

_____

[5]To support her "mutually exclusively verdicts" argument, the defendant also relies on the holding of this court in State v. Chris Jones, No. W2009-01698-CCA-R3-CD, 2011 WL 856375 (Tenn. Crim. App. Mar. 9, 2011), perm. app. denied (Tenn. Aug. 25, 2011), which states that such verdicts occur when a jury "'necessarily reached two positive findings of fact that cannot logically mutually exist.'" Id. at *10 (quoting Jackson v. State, 577 S.E.2d 570, 574 (Ga. 2003)). This holding was explained further in State v. Marlo Davis, No. W2011-01548-CCA-R3-CD, 2013 WL 2297131, at *7-8 (Tenn. Crim. App. May 21, 2013), perm. app. granted (Tenn. Nov. 13, 2013). However, as we have explained, the verdicts in this matter are not mutually exclusive. Thus, application of this doctrine would not benefit the defendant.

consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established.  Id. at 283.

Applying a plain error analysis does not benefit the defendant.  While the defendant is correct in setting out the State's argument, we disagree with her as to the effect of that argument.  A "clear and unequivocal rule of law" was breached and a "substantial right of the accused" was affected only if we accept the defendant's interpretation of the State's rebuttal argument.  We do not accept her view, and, accordingly, consideration of the matter is not required because of a "clear and unequivocal rule of law" or "[a necessity] to do substantial justice."

This assignment is without merit.

### IV.  Convictions for Counts 1 and 2 Violate Double Jeopardy

The defendant similarly argues that her convictions for both aggravated child neglect and reckless aggravated assault constitute double jeopardy because the bill of particulars stated that Counts 1 and 2 included the same general conduct, depriving the victim of oxygen.  She acknowledges that she did not raise this issue in the trial court but that it affects her substantial rights, and, therefore, we may consider it as "plain error."  The State responds that the trial court's merging the two convictions "eliminates or cures any double jeopardy concerns because [the defendant] stands guilty and punishable of only one offense."  We agree with the State.

As this court explained in State v. Zirkle, 910 S.W.2d 874, 889 (Tenn. Crim. App. 1995), any error in imposing two sentences for a single offense is cured by merging the judgments:

> Though the defendant['s] initial convictions for both premeditated first degree murder and felony murder subjected him to double jeopardy, the trial court ultimately merged those convictions into a single conviction for premeditated first degree murder.  The jury also returned separate guilty verdicts for both the felony murder and premeditated first degree murder, indicating that the jury was satisfied that the proof supported a conviction for either offense.  Our independent review of the record leads us to the same conclusion.  Under similar circumstances, our supreme court held that while it was error to impose two sentences for a single killing, vacating one of the murder convictions cured the double jeopardy problem.  State v. Hurley, 876 S.W.2d 57 (Tenn. 1993), cert. denied, 513 U.S. 933, 115 S. Ct. 328, 130 L. Ed. 2d 287 (1994).

36

In State v. Eddie Medlock, No. W2000-03009-CCA-R3-CD, 2002 WL 1549707 (Tenn. Crim. App. Jan. 16, 2002), perm. app. denied (Tenn. July 1, 2002), this court explained that "'[a] trial court should instruct a jury to render a verdict as to each count of a multiple count indictment which requires specific jury findings on different theories . . . and if the jury does return a verdict of guilt on more than one theory . . . the court may merge the offenses and impose a single judgment of conviction.'" Id. at *4 (quoting State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997)).

We conclude that the defendant's claim that the verdicts are mutually exclusive is without merit. The true issue, we believe, is whether double jeopardy rights are violated when a defendant is tried for one offense, consisting of a series of acts, and a second offense, based upon a single act, which is one of the series of acts of the first count, but alleged to have been committed in a different fashion and is convicted as charged for the first offense but of a lesser charge in the second. The defendant's analysis considers not this issue but, instead, whether a defendant's double jeopardy rights are violated when she is convicted of two indictments, based upon the same series of acts. As we have set out, we do not consider this issue to accurately reflect the procedural posture of this case. Therefore, it is without merit.

Finally, we reject the defendant's claim that she was entitled to an instruction that she could be convicted of only one of the offenses. This argument relies upon her interpretation of the errant sentence in the State's rebuttal argument. As we have set out, it does not accurately reflect the procedural posture of this case. It, thus, is without merit.

As we have stated, the trial court entered judgments for both aggravated child abuse and reckless aggravated assault, with the latter being merged into the former. The defendant argues that her double jeopardy rights were violated by the dual convictions and that the violation is not rectified by the merger. As we have set out, our view of the bases for these two verdicts differs from that of the defendant. Her arguments are predicated upon the view that the neglect and assault charges are based upon the same multiple claims. We disagree. The issue presented by this case is whether both convictions may stand when the neglect charge is based upon a series of claims, while the assault charge is based upon one of the claims in the series, but alleges an alternative manner in which it was done. The parties have not squarely dealt with this issue.

However, the State has not argued that the court erred by this merger and that both verdicts should stand. Accordingly, we will consider only the defendant's claim that a single judgment should have been filed, reflecting the merger. We agree with this argument. In State v. Addison, 973 S.W.2d 260, 267 (Tenn. Crim. App. 1997), this court held that "the trial court's entry of only one judgment of conviction imposing only one sentence of life imprisonment protects the defendant from receiving multiple punishments for the same

37

offense." Applying the holding in <u>Addison</u>, we remand this matter to the trial court for entry of a single judgment, for the offense of aggravated child neglect and reflecting that the conviction for reckless aggravated assault was merged into it.[6]

## V. Error in Allowing Testimony by Dr. Reece

The defendant's next three issues are interrelated ones that revolve around the testimony of Dr. Reece. The defendant contends that the trial court "committed error upon error" regarding Dr. Reece's testimony "that resulted in the jury hearing inadmissible expert opinion testimony akin to that deemed unreliable in <u>Ward</u>." She argues the trial court erred in the following ways: (1) by allowing the State to provide its experts with "any information whatsoever about Stephen and Stephanie Ward" because, "[a]lthough Dr. Reece testified that experts in his field considered sibling medical history and 'social history' to evaluate injury causation, he never explained how that information provided a *reliable* foundation for opinions on that issue"; (2) by denying her motion to disqualify Dr. Reece from testifying after the State provided him with highly prejudicial information about the manner of death of the other children, in direct violation of the trial court's orders; (3) by not limiting Dr. Reece's trial testimony to the narrow scope permitted by the trial court's pretrial order; (4) by denying the defendant a <u>McDaniel</u> hearing on the admissibility of Dr. Reece's opinions; and (5) by admitting Dr. Reece's testimony when it did not qualify as "expert opinion testimony" under Tennessee Rules of Evidence 702 and 703.

To aid in an understanding of these issues, we must review exactly what transpired with respect to Dr. Reece's testimony, both before and during the trial. As we have previously set out, the trial court entered an order early in the pretrial period that specified exactly what information could be furnished to Dr. Reece:

> As for the other information referenced by Dr. Reece, the Court finds it appropriate to provide any proposed experts['] information regarding (1) information about the pregnancy as well as how many pregnancies the mother had experienced prior, (2) information about previous labors, (3) health of the mother during the pregnancy, (4) length of labor, (5) all of the [victim's] medical records including information related to blood glucose levels (noting greater than 260 indicates the baby is stressed generally from cardio-adrenal

---

[6]At trial, both parties agreed that the verdicts should be merged, an opinion which the State has continued on appeal. The defendant now argues her conviction as to Count 2, being the lesser offense, should be vacated. We have directed that a single judgment be entered, reflecting the conviction for Count 1. The issue as to whether, given the unique specific claims of the bill of particulars, the court could have determined that both verdicts stand and that merger was not required, is not before this court. Therefore, we take no position on that issue.

stimulation), heart and lung information, and brain wave test results, (7) medical histories of any other children born to the mother including cause of death without indicating manner of death is anything other than undetermined, and (8) any statements [d]efendant provided to medical personnel or law enforcement regarding her pregnancy and birth of [the victim] as well as any statements [d]efendant provided to medical personnel or law enforcement regarding the births of her other children.

Dr. Reece subsequently provided a report in which he mentioned the defendant's having had two other children who suffered unexplained deaths, one of which had been "actually diagnosed as a smothering death." In response, on March 11, 2009, the defendant filed a motion to disqualify Dr. Reece from testifying as an expert witness, asserting that the State had violated the trial court's order by providing prohibited information to him, including information that she had been charged with murder for smothering two of her children.

After holding a hearing, the trial court entered an order on July 24, 2009, in which it found that the State had committed "multiple violations" of the court's order in the documents provided to Dr. Reece. The trial court noted that the packet of materials provided to Dr. Reece contained "multiple references to homicide," and that the State had even conceded in its response to the motion that it had provided Dr. Reece with information that the defendant was indicted and charged with homicide in the deaths of Stephen and Stephanie Ward and that she was under various bond conditions in connection with those charges. The trial court listed the "most egregious examples" of the State's violation of its order as follows:

- Document prepared by State titled "Summary of Charges–State vs. Vernica Ward, AKA Vernica Jackson, AKA Vernica Calloway CPN 06-647786" where the State sets forth Defendant's pending charges in case no. 2004-D-2901, explicitly stating that Defendant is charged with first degree murder and aggravated child abuse due to the allegation "she smothered two of her other children."

- Affidavit in Support of Search Warrant noting in the statement of facts in support of probable cause that "Affiant learned that the [Defendant] is currently out on bond awaiting trial in the death of another child that she gave birth to."

- Tennessee Bureau of Investigation[] Request for Examination form that lists Stephanie Madi Ward as the victim and indicates

39

the type of offense being investigated as "Hom[i]cide /Murder."

The trial court additionally noted that the State had provided a number of other "curious[ly]" redacted documents to Dr. Reece that "demonstrate strategic redaction where the State engaged in a partial redaction but left words implying suspicious activity that would lead the reader to infer that medical examiners had ruled death of other children being a result of some type of criminal act[.]"

The trial court concluded, however, that the proper remedy for the State's violations of its order was not to exclude Dr. Reece's testimony, but instead to limit its scope. Specifically, the court ruled that Dr. Reece could testify regarding his opinion that the victim suffered hypoxia after her birth but could not testify that she was intentionally suffocated unless the State could show that his opinion was based only on information he received that had been authorized by the court. The trial court's ruling states in pertinent part:

> Considering the totality of the circumstances in this case, the Court finds it must ameliorate this situation in a way that is fair to both parties. The State has already incurred much expense attempting to locate an[] expert and requiring the State to start from scratch again would further delay Defendant's right to a trial. The State, however, did violate this Court's orders and must not benefit from this violation. Accordingly, the Court finds that Dr. Reece is permitted to testify to limited portions of his report.

> Specifically, the first seven paragraphs of Dr. Reece's report that describe the medical history of [the victim] as well as Defendant's statements regarding the birth of [the victim]. All of this information was permitted to be provided to Dr. Reece. Based on this information, Dr. Reece concluded that [the victim] was breathing at birth and that the injuries were a result of hypoxia after birth rather than an injury incurred during the home birthing process. Thus, Dr. Reece is permitted to testify as to this opinion.

> However, in paragraphs eight through ten of his report, Dr. Reece refers to the deaths of Defendant's other two children, Stephen and Stephanie Ward, commenting that Stephanie was "smothered." In these paragraphs, Dr. Reece appears to be referencing the "rule of three," which has been previously litigated. Based on his knowledge of the events surrounding Stephen Ward and particularly Stephanie Ward's deaths, he offers the additional opinion that [the victim's] hypoxic brain damage resulted from "intentional suffocation by her mother." This opinion is not admissible for two reasons. First, unless the State can demonstrate otherwise, Dr. Reece based his opinion that [the victim] was "intentionally suffocated" on the facts surrounding Stephen Ward and

40

particularly Stephanie Ward's deaths (as noted in paragraphs eight through ten of his report). Second, it is not Dr. Reece's position to make a legal conclusion as to who cause[d] the intentional suffocation. As a medical expert, he may be able to conclude based on the facts that a victim was intentionally suffocated but that does not allow him to invade the jury's province to determine *who* caused the intentional smothering.

Accordingly, the Court finds that Dr. Reece is limited to testifying to the medical history of [the victim] (for example, he can explain to the jury in layman's term[s] what hypoxia means and how it is caused) and offer his opinion that [the victim's] hypoxic brain damage resulted after birth (that is, it did not occur during the birth of [the victim]). Unless the State is able to demonstrate to this Court that Dr. Reece formulated his opinion that [the victim] was intentionally asphyxiated, or smothered, independent of any knowledge as to the manner of either Stephen or Stephanie[] Ward['s death] possibly being a homicide, he is prohibited from testifying on this issue. Regardless of whether the Court is persuaded that Dr. Reece may testify that the injuries are a result [of] intentional suffocation, Dr. Reece is prohibited from testifying that the suffocation was caused by "her mother, the only person with her at the time."

On May 24, 2010, a few weeks prior to trial, the defendant filed a "Motion to Limit Dr. Reece's Testimony to Matters Approved" by the court's above ruling, noting that the State had not provided any updated expert witness reports or data to show that Dr. Reece formulated his opinion that the victim died of intentional suffocation independently of his information about the deaths of the victim's siblings, and asserting that any attempt by the State to do so at such a late date would unfairly prejudice the defendant's ability to defend herself at trial.

On June 3, 2010, the defendant filed a motion for a jury-out hearing for the court to determine whether the opinions Dr. Reece intended to offer in the case were based on reliable scientific evidence or mere speculation and whether his opinions fell within his specific area of expertise. In the motion, the defendant specifically referenced Dr. Reece's opinion in his report that the victim was born healthy and suffered a hypoxic injury sometime after her birth, arguing that such an "opinion" was based merely on Dr. Reece's speculation rather than on reliable scientific evidence.

In a June 4, 2010 hearing held before the June 7 start of the trial, defense counsel argued for the necessity of a jury-out hearing to determine whether Dr. Reece's testimony would involve opinions that exceeded the scope of his expertise since he was a pediatrician rather than a neonatologist. The trial court denied the motion, finding that Dr. Reece's

speciality went more towards the weight of his testimony rather than its admissibility. The trial court additionally ruled that it would hold a hearing outside the presence of the jury to consider whether it would allow Dr. Reece to testify as to any opinions that went beyond the first seven paragraphs of his report.

On June 9, 2010, the third day of trial, the trial court held a jury-out hearing at which Dr. Reece testified that his knowledge the defendant had been indicted in connection with the deaths of her other children in no way influenced the opinions he formed regarding the victim's injury and that his opinion regarding the victim's injury was "independent of those things." He further testified that he was familiar with the "rule of three" but had not relied on it in reaching his opinions in the case.

On cross-examination, he testified that he believed that "independent of that past history that [he] was supplied that [he] still would have come to the same conclusions about [the victim's] reason for her hypoxic injury." Upon further cross-examination, he reiterated that even if he had not received the prohibited information, he would still have rendered an opinion that it was a case of intentional asphyxiation, based not on any medical findings or tests but, instead, on the defendant's behavior and the circumstances surrounding the pregnancy and birth, which, due to his years of experience in child abuse cases, led him to conclude that she had either malignantly neglected or intentionally suffocated the victim after her birth:

> Q. All right. And is it your opinion that that – is it your testimony that that opinion [that the victim was intentionally suffocated] is based on medical science and that you can prove that or that that's just your opinion?
>
> A. Well, it's my opinion. I don't think anyone can prove exactly what happened to this child at that time. I just don't think that's possible. Medical science notwithstanding. I don't think anyone was there, and I don't think that anyone except the mother knows exactly what happened. However in the absence of other findings, other reasons to believe that this child had a suffocatory event after birth, that is by aspiration of secretions or by overlaying when the mother became unconscious. The only conclusion that one can reach in my opinion from a common sense standpoint is that she probably had her hand over the mouth and nose of this baby and suffocated the baby. Now, can I say that with absolute certainty with medical science to prove it? No. Nobody can. And I don't think that anybody can say that it didn't happen. That's the problem with this case. No one was there. This was an unwitnessed event. And so I think we are left with what we have, with what we know. And my conclusion on the basis of that is that she most likely suffocated the baby intentionally.

42

Q. And when you say "most likely," is that fifty-one, forty-nine or is that just - -

A. No, it's simply a matter of I can't be a hundred percent sure, which is what I just finished saying. I can't be absolutely sure. But if I have to make a judgment about what happened to this baby, it would be that.

Q. And you can make that judgment without relying upon any information related to the social history just upon the circumstances surrounding [the victim's] birth?

A. Yes, yes. Well, I think the social history surrounding the absence of prenatal care, the concealment of the pregnancy, the fact that she didn't seek medical attention by calling 911, the fact that she went to the hospital several hours after the delivery of the baby. The whole peculiar nature of her response to this baby's birth all come together for me as a pediatrician who has seen many, many kids being born both inside and outside of the hospital – it's just the whole constellation of the picture tells me that my conclusion is probably right.

Q. And you're basing that conclusion on essentially an aggregation of factors that you would consider?

A. Of the factors that we know.

Q. Okay. Prior DCS involvement with the mother?

A. I didn't even consider that at this point. I think that taking this delivery in a toilet in a locked bathroom and then concealing the fact that this baby had been delivered and not taking this baby for appropriate medical care immediately after the delivery all speak to me as to be almost a malignant neglect if not intentional suffocation.

Q. And that's your opinion?

A. That's my opinion. That's what you asked me.

Q. Right. But not based on any medicine?

A. You're not going to base this on medical thing [sic]. It's just not going to be possible by medical science to prove this one way or the other.

43

Q. Is it as you said earlier a matter of common sense?

A. It's not common sense, but it's certainly a good aggregate thinking about all of the circumstances of this situation.

Q. Do you think that thinking jurors are capable of doing it themselves without the assistance of an expert?

A. I'm not going to opine that. I don't know.

Q. Is there any particular expertise that you have in this area that renders you more capable of doing that than jurors?

A. Oh, I think so. I've spent almost fifty years as a physician. I've seen many, many, many cases, and I have specialized in child abuse for the last thirty years. Yes, I do think I have an expertise that's beyond the average juror. But . . . I don't think that jurors are unable to form opinions about what happens in these kinds of cases.

Upon questioning by the trial court, Dr. Reece said that he could testify without reference to the information he had received about Stephanie and Stephen Ward's deaths but that he thought such information would be helpful to aid the jury in understanding the case because it established " a pattern of things." When the court pointed out that he would be getting into unauthorized propensity evidence if he did so, he assured the court that he could testify about the victim's injury without mentioning the asphyxiation deaths of her siblings or his opinion that the defendant was the person responsible for the intentional asphyxiation of the victim.

At the conclusion of the hearing, the trial court qualified Dr. Reece as an expert in the field of pediatrics and child maltreatment and ruled that he would be allowed to testify as to his opinion that the victim's hypoxic injury occurred as the result of an intentional suffocation, so long as he did not refer to the circumstances surrounding the deaths of the victim's siblings or offer his opinion that the defendant was the individual responsible for the injury.

On appeal, the defendant first argues that the trial court erred by ruling that the State's experts could be provided with any information about the deaths of the victim's siblings, asserting that Dr. Reece failed to testify at the pretrial hearing how such information was reliable. We respectfully disagree.

Tennessee Rule of Evidence 703, "Bases of Opinion Testimony by Experts" provides

in pertinent part:

> The facts of data in the particular case upon which an expert bases an opinion or inference may be those perceived or known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. . . . The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

At the April 21, 2008 pretrial hearing, Dr. Reece had testified that it would be important to an expert in his fields of pediatrics and child maltreatment to have access to the social and medical history of the victim's siblings and the defendant's prior pregnancies, including any history of spontaneous abortions, in order to eliminate a medical or genetic cause of the victim's injury and to determine if the injury was accidental or non-accidental. He described in detail how such information would be important to an expert such as himself and testified that it was routine in his field of practice to look at such medical records, which he described as "usually very reliable." We conclude, therefore, that the record supports the ruling of the trial court that Dr. Reece could be provided with the medical histories of the victim's siblings.

The defendant next argues that the trial court erred by not disqualifying Dr. Reece as a witness following the State's violation of the court's order regarding the type of information it could provide to him about the deaths of the victim's siblings. We, again, respectfully disagree. In our view, the trial court, in its original order, fashioned an appropriate remedy for the violation by limiting Dr. Reece's testimony to the information contained in the first seven paragraphs of his report.

The defendant next argues that the trial court erred by its reversal of its order limiting Dr. Reece's testimony to the narrow scope permitted by the court's pretrial order, by denying her a McDaniel hearing on the admissibility of Dr. Reece's opinion that the victim's injury resulted from intentional suffocation, and by admitting Dr. Reece's testimony when it did not qualify as "expert opinion testimony" under Tennessee Rules of Evidence 702 and 703.

The admission of expert testimony is governed by Tennessee Rules of Evidence 702 and 703. Rule 702 provides that "[i]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." Tenn. R. Evid. 702. Rule 703 provides that expert testimony shall be disallowed "if the underlying facts or data indicate lack of trustworthiness." Tenn. R. Evid. 703.

45

In McDaniel, 955 S.W.2d at 265, our supreme court recited several nonexclusive factors that a court may consider in determining the reliability of scientific testimony, including:

"(1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation."

Brown v. Crown Equipment Corp., 181 S.W.3d 268, 274 (Tenn. 2005) (quoting McDaniel, 955 S.W.2d at 265). The Brown court identified two other factors that a trial court may consider in assessing the reliability of an expert's methodology: (1) the expert's qualifications for testifying on the subject at issue, and (2) the connection between the expert's knowledge and the basis for the expert's opinion. Id. (citations omitted).

"[T]he allowance of expert testimony, the qualifications of expert witnesses, and the relevancy and competency of expert testimony are matters which rest within the sound discretion of the trial court." State v. Rhoden, 739 S.W.2d 6, 13 (Tenn. Crim. App. 1987) (citing Murray v. State, 377 S.W.2d 918, 920 (Tenn. 1964); Bryant v. State, 539 S.W.2d 816, 819 (Tenn. Crim. App. 1976); State v. Holcomb, 643 S.W.2d 336, 341 (Tenn. Crim. App. 1982)). As such, we will not disturb the trial court's ruling absent a clear showing that it abused its discretion in admitting the testimony. Id.; State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002).

We disagree that the trial court erred by not holding another hearing on the admissibility of Dr. Reece's opinions or by admitting Dr. Reece's experience-based testimony as expert opinion testimony. As the State points out, the trial court held a McDaniel hearing on April 21, 2008, followed by a number of additional evidentiary hearings, including the one held after the start of the trial, at which it considered the reliability and admissibility of Dr. Reece's opinion testimony. Moreover, Dr. Reece established at the mid-trial hearing that he was basing his opinions rendered in the case on his years of experience as a pediatrician and expert in child maltreatment. Based upon this testimony, the trial court determined that an additional McDaniel hearing was not required and Dr. Reece could testify that, with the surrounding facts, as he explained, the suffocation was intentional, in his professional opinion. In her reply brief, the defendant argues that the April 21, 2008 hearing was not a McDaniel hearing, for Dr. Reece did not issue his final report "until much later." We disagree with the defendant's analysis as to a McDaniel hearing and conclude that the record supports the trial court's determination.

46

Additionally, the defendant argues that she was prejudiced by the court's determination, during the trial, that Dr. Reece would be permitted to testify that, in his professional opinion, the smothering of the victim was an intentional act. As we have set out, there was abundant circumstantial evidence, even absent the testimony of Dr. Reece, from which the jury reasonably could have determined that the defendant intentionally suffocated the victim. Accordingly, we conclude that this assignment of error is without merit.

## VI.  Error in Allowing "Learned Treatise" Evidence

The defendant next contends that the trial court erred by allowing the State to introduce as substantive evidence a July 2006 article entitled "Distinguishing Sudden Infant Death Syndrome From Child Abuse Fatalities," which was a joint publication of the American Academy of Pediatrics and the National Association of Medical Examiners. In support, the defendant cites, among other things, Tennessee Rule of Evidence 618, which provides in pertinent part that "statements contained in published treatises . . . established as a reliable authority . . . may be used to impeach the expert witness's credibility but may not be received as substantive evidence." The State concedes that the trial court erred in admitting the evidence, arguing the error was harmless, and we agree. In this regard, the State asserts that the article was admissible not to bolster the testimony of Dr. Reece, but rather to explain his reasons for requesting the information which he did regarding this matter. We agree and conclude, as did the State, that the trial court erred in allowing this article into evidence but that its admission was harmless.

## VII.   Errors in Allowing Irrelevant, Confusing, Misleading, and Prejudicial Evidence

The defendant next contends that the trial court committed reversible error by admitting "irrelevant, confusing, misleading, and unfairly prejudicial evidence" about the defendant's other children and her actions in the months and days before the victim's birth. She further contends that the trial court erred by not instructing the jury on how it could consider the evidence and by failing to limit the State's arguments about the evidence. Specifically, the defendant complains about the introduction of evidence of her concealment of her pregnancy with the victim, of the false and inconsistent statements she gave about her pregnancy history, of her refusal to give the DCS employee the names of her other children, and of the history of her previous pregnancies, including the prenatal care she received during those pregnancies and her home delivery in 2001. The defendant argues that the trial court should have excluded the evidence under Tennessee Rules of Evidence 401, 402, 403, and 404(b) as irrelevant, misleading, unfairly prejudicial, and prohibited "bad act" evidence whose prejudicial effect outweighed any probative value.

47

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. All relevant evidence, subject to certain exceptions, is generally admissible under Rule 402 of the Tennessee Rules of Evidence. Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice." Tenn. R. Evid. 403.

Tennessee Rule of Evidence 404(b) provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Exceptional cases in which evidence of an accused's prior bad acts will be admissible include those in which the evidence is introduced to prove identity, intent, motive, opportunity, or rebuttal of mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995); see also Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[7][a] (5th ed. 2011). Where the trial judge has substantially complied with procedural requirements, the standard of review for the admission of bad act evidence is abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). Because the trial court in this matter complied with the requirements of Rule 404(b), we review its rulings under an abuse of discretion standard.

Following the pretrial hearing, the trial court found that evidence that the defendant concealed her pregnancy with the victim was "clear and convincing," was relevant for the

State to prove the defendant's motive and intent, and that the probative value of the evidence outweighed the possible prejudice from its admission. We conclude that the record supports this determination by the trial court.

The trial court, likewise, found that evidence of the defendant's having given false and inconsistent information about her pregnancy and having refused to provide the names of her other children was clear and convincing, relevant to establish the defendant's motive and intent, and that its probative value outweighed its prejudicial effect. The defendant asserts that the trial court failed to state for the record how the defendant's having refused to provide the names of her children to DCS employee Gooch was relevant to any issue at trial. In our view, however, the trial court's ruling that the evidence went "to the issues of her concealment, . . . hampering the investigation and of providing false information" contains an implicit finding that such evidence, similar to the defendant's having provided false and misleading information to health professionals about her pregnancy, was relevant to show the defendant's motive and intent. We conclude, therefore, that the trial court did not err in admitting the evidence.

The defendant also complains about the trial court's having admitted evidence about the defendant's prior pregnancies, prenatal care in those pregnancies, and alleged home delivery of a child in 2001. The defendant argues that such evidence, among other things, was irrelevant to any material disputed issue at trial, was misleading to the jury, and that its prejudicial effect substantially outweighed any probative value.

Our supreme court explained in State v. James, 81 S.W.3d 751, 760 (Tenn. 2002), the role of the appellate court in reviewing evidentiary rulings of the trial court:

> Rulings on the admissibility of evidence are largely within the sound discretion of the trial court, and on appellate review, a trial court's ruling to admit or exclude evidence will not be disturbed unless it appears that such a ruling amounts to an abuse of that discretion. [State v.] DuBose, 953 S.W.2d [649,] 652 [(Tenn. 1997)]. . . . "'[A]n appellate court should find an abuse of discretion when it appears that the trial court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Stevens, 78 S.W.3d 817 (Tenn. 2002) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

The trial court found that evidence of the defendant's prenatal care during previous pregnancies was relevant to the defendant's "history about this pregnancy and whether or not she sought care and whether or not she had knowledge that she was needing care." The court found that evidence of the defendant's statements about her prior prenatal care was relevant "to show that she knows what she's supposed to do and she did or did not do it." The court

49

found evidence of her alleged home birth in 2001 was relevant to show "negligence and/or other than by accidental means" and that its probative value outweighed any unfair prejudice.

As we have previously discussed, the defendant's lack of prenatal care with the victim does not constitute a crime under the child abuse and neglect statutes. However, evidence about her prior pregnancies, prenatal care, and childbirths was arguably relevant to show that the defendant was familiar with pregnancy and the birthing process and therefore should have recognized what was happening to her body on October 31, 2006, in time to seek help for herself and the victim. Thus, we cannot find that the trial court abused its discretion in admitting the evidence. Moreover, even if the evidence was admitted in error, we have no hesitation in concluding that it was harmless error. Tenn. R. App. P. 36(b).

We further conclude that the trial court did not err in not instructing the jury as to how it could consider the evidence or in not limiting the State's arguments with respect to the evidence. The defendant is not, therefore, entitled to relief on the basis of this issue.

## VIII. Error in Not Redacting Portions of the Defendant's Statement to Police

The defendant contends that the trial court erred by denying her motion to redact portions of her interviews with the police and DCS. Specifically, she argues that the trial court erred by not redacting her statements about the prenatal care she received during her pregnancies with two other children and not redacting the final several minutes of her interview, in which, according to the defendant, her expressions of concern about what was going to happen to her "created a significant and unfair danger that the jury would misinterpret her reaction as an overreaction of guilt."

The record reflects that, after an earlier hearing, the trial court suppressed portions of the interviews in which the defendant spoke about the deaths of the three children. At a June 4, 2010 hearing, the State agreed to redact other portions of the statements, and the trial court ordered that the defendant's comment that it seemed as if everyone was out to get her should be redacted from the statement. The trial court ruled that the defendant's statements about her prenatal care with other pregnancies, the fact that she had two other children who lived in Nashville, and the defendant's comments about how she did not know what to say and her mind was racing should be left in the statement. We can find no error in these rulings. Accordingly, we conclude that the defendant is not entitled to relief on the basis of these issues.

## IX. Error in Allowing Testimony by Victim's Foster Mother

The defendant contends that the trial court erred "by allowing the State to introduce irrelevant and highly prejudicial testimony from the alleged victim's foster mother." The

50

defendant argues that Ms. Frazier-Weir's testimony about the victim's injury was irrelevant because she did not begin caring for the victim until more than two years after the alleged injury occurred, and the State had already "clearly established that [the victim] suffered a permanent injury through the undisputed testimony of the neonatologists." She further argues that even if Ms. Frazier-Weir's testimony was somehow relevant, its probative value was substantially outweighed by the unfair prejudice it created, asserting that Ms. Frazier-Weir's testimony essentially amounted to improperly admitted "victim impact evidence" that was designed to draw on the jurors' sympathies and emotions.

We disagree that Ms. Frazier-Weir's testimony about the victim's mental and physical impairments was irrelevant to the issue of whether she had suffered a permanent, serious injury or that Ms. Frazier-Weir's descriptions of the victim amounted to improper victim impact evidence. Moreover, even if it were error to admit the evidence, we would conclude that it was harmless.

## X. Excessive Sentence

Finally, the defendant contends that the trial court imposed an excessive sentence by erroneously concluding that she was a violent offender and by imposing the maximum sentence within the range.

Under the 2005 amendments to the sentencing act, a trial court is to consider the following when determining a defendant's sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;

(2) The presentence report;

(3) The principles of sentencing and arguments as to sentencing alternatives;

(4) The nature and characteristics of the criminal conduct involved;

(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;

(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and

(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

51

Tenn. Code Ann. § 40-35-210(b) (2010).

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and "sentences should be upheld so long as the statutory purposes and principles, along with any enhancement and mitigating factors, have been properly addressed." State v. Bise, 380 S.W.3d 682, 706 (Tenn. 2012). Accordingly, we review a trial court's sentencing determinations under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." Id. at 707.

The State concedes that the defendant should not have been sentenced as a violent offender because aggravated child neglect was held in Dorantes to be a separate offense from aggravated child abuse, and aggravated child neglect is not one of the enumerated felonies in Tennessee Code Annotated section § 40-35-501(i)(2) that requires 100% service of the sentence. We agree that the defendant should have been sentenced as a Range I, standard offender to serve her sentence at 30% release eligibility rather than as a violent offender at 100% release eligibility.

In sentencing the defendant to the maximum sentence within the range, the trial court found the following enhancement factors applicable: (1) that the defendant had a previous history of criminal convictions, based upon her prior theft conviction; (4) that the victim was particularly vulnerable because she was a new baby born at home; and (14) that the defendant abused a position of trust. See Tenn. Code Ann. § 40-35-114(1), (4), (14). We conclude that the trial court's finding of these enhancement factors and its imposition of the maximum sentence within the range fell within its broad discretion in sentencing. Thus, although we affirm the length of the sentence, we remand for entry of an amended judgment setting the defendant's release eligibility at 30%.

## **CONCLUSION**

Based upon the foregoing authorities and reasoning, we remand this matter for entry of a single judgment reflecting that the defendant's sentence is to be served with a 30% release eligibility. In all other respects, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

## STATE OF TENNESSEE v. VERNICA SHABREE CALLOWAY

### Criminal Court for Davidson County
### No. 2007-C-2178

No. M2011-00211-CCA-R3-CD

FILED
APR 4 2014
Clerk of the Courts

## ORDER

This court's opinion in this matter, on the defendant's appeal, was filed on September 24, 2013. Subsequently, the defendant filed a petition to rehear, pursuant to Tennessee Rule of Appellate Procedure 39(e), asserting, in brief, that the court had overlooked a well-settled legal proposition and conflicted with a well-settled proposition of law. The State responded that the petition should be granted for the court "to clarify its reasoning."

We have considered the defendant's petition and the State's response and conclude that the petition should be granted. Accordingly, the opinion filed in this matter on September 24, 2013, is withdrawn and replaced with the opinion accompanying this order.

PER CURIAM
(Glenn, Ogle, Page, JJ.)